## Wytheville.

J. E. WARREN, GEORGE S. BARNES, W. S. GREENE
AND MINNIE E. GREENE v. E. M. GOODRICH
AND E. F. PILAND, PARTNERS DOING BUSI-
NESS · UNDER THE FIRM NAME AND
STYLE OF GOODRICH STRIP AND
SCREEN COMPANY.

June 15, 1922.

1. WORKING CONTRACTS—*Instructions—Abrogation of Original Contract by Changes and Alterations.*—In an action by contractors to recover a certain sum from the owners of buildings due the contractors on account of materials furnished and labor done in remodeling the buildings, the court instructed the jury that they should find that the original written contract for the remodeling was abrogated if they believed that the additions, omissions or alterations made by the direction of the owners, or their duly authorized agents, so departed from the contract as to make it impossible to calculate the effect upon the contract price.

   *Held:* That the giving of this instruction was error because there was no evidence to support it. The very testimony for the contractors which was introduced on this subject showed that the contractors knew, at the times the changes were directed, just what the changes from the plans covered by the contract were, in the utmost detail; that such plans were not wholly changed; and that, if the contractors had kept their books accordingly, there was no impossibility in their having had their books show precisely what expense to them, over and above the contract figures, if any, was occasioned by the changes.

2. WORKING CONTRACTS—*Instructions—Abrogation of Original Contract by Changes and Alterations.*—In an action by contractors to recover a certain sum from the owners of buildings due the contractors on account of materials furnished and labor done in remodeling the buildings, the court instructed the jury that they should find that the original written contract for the remodeling was abrogated if they believed that the additions, omissions or alterations made by the direction of the owners, or their duly authorized agents, so departed from the contract as to make it impossible to calculate the effect upon the contract price.

*Held:* That this was too vague and indefinite to serve as a proper guide to the jury upon the question in issue.

3. WORKING CONTRACTS—*Instructions—Abrogation of Original Contract by Changes and Alterations.*—The impossibility mentioned in an instruction to the effect that an original building contract was abrogated if the additions, omissions, or alterations made by the direction of the owners, so departed from the contract as to make it impossible to calculate the effect upon the contract price was not limited by the terms employed, and hence consisted of any impossibility whatsoever. Under such an instruction an impossibility on the part of the jury to calculate from the evidence before them the effect upon the contract price occasioned by the changes aforesaid would have warranted them in finding the written contract abrogated. Such could not be the law, for it would offer a premium to a plaintiff in such situation to omit to prove his case.

4. WORKING CONTRACTS—*Instructions—Abrogation of Original Contract by Changes and Alterations.*—In an action by contractors to recover a certain sum from the owners of buildings due the contractors on account of materials furnished and labor done in remodeling the buildings, the court instructed the jury that they should find that the original written contract for the remodeling was abrogated if they believed that the additions, omissions or alterations made by the direction of the owners, or their duly authorized agents, so departed from the contract as to make it impossible to calculate the effect upon the contract price.

*Held:* Error, as not giving the true standard by which to determine whether the special contract had been abrogated by subsequent changes, mutually agreed upon.

5. WORKING CONTRACTS—*Abrogation of Original Contract by Changes and Alterations—Standard by which to Determine Whether Contract is Abrogated.*—The correct standard by which to determine whether an original building contract has been abrogated by subsequent changes, mutually agreed upon, is this: To abrogate the contract, the building must be so materially changed by such deviation from the contract that it cannot be reasonably recognized as the same building, or work, as that provided for in the original contract; that is to say, to abrogate the special contract, the plans covered by it must have been so entirely abandoned by the additions or omissions as to make it impossible to trace the work provided for in the contract, and to say to what part of the work the contract applied and to what part it did not.

6. INSTRUCTIONS—*Error Not Cured by Other Instructions—Instruction Directing a Verdict—Working Contracts—Abrogation of Original Contract by Changes and Alterations.*—An erroneous instruction that the jury should find that an original building contract was abrogated if they believed that the additions, omissions, or alterations made by the direction of the owners, so departed from the contract as to make it possible to calculate the effect upon the contract price, being

complete in itself, in that it directed a verdict, 'was not cured by other instructions, correctly stating the law on the subject of the abrogation of the original building contract.

7. WORKING CONTRACTS—*Abrogation of Original Contract by Changes and Alterations—Intention to Abrogate Must be Clear.*—Where the deviations from an original building contract, which are relied on as having wholly abrogated that contract, are made by mutual consent, the law is that, for the deviations to have that effect, the mutual intention that they shall have that effect, must be apparent or clearly shown by implication. That is to say, there must be clear, unequivocal, and convincing evidence, direct or implied, of such intent on the part of the owner, as well as of the contractor, before such effect ensues.

8. WORKING CONTRACTS—*Abrogation of Original Contract by Changes and Alterations—Intention to Abrogate Must be Clear—Case at Bar.*—In the instant case, there was an entire absence of evidence tending to show that what the owners did was not entirely consistent with the intention not to abrogate the original building contract further than was occasioned by the changes which were made by the mutual ·consent of the owners and the contractors. Moreover, counsel for the contractors at the trial did not take the position that the original contract had been entirely abrogated.

   *Held:* That the intent on the part of the owners to entirely abrogate the contract was not shown by the clear and convincing evidence which the law requires.

9. PAROL EVIDENCE—*Varying Written Contract—General Rule—New Contract.*—A simple contract completely reduced to writing cannot be contradicted, changed, or modified by parol evidence of what was said and done by the parties to it at the time it was made, because the parties agreed to put the contract into writing and to make the writing part and evidence thereof. The very purpose of the writing is to render the agreement more certain and to exclude parol evidence of it. Nevertheless, by the rules of the common law, it is competent for the parties to a simple contract in writing, before any breach of its provisions, either altogether to waive, dissolve, or abandon it, or add to, change, or modify it, or vary or qualify its terms, and thus make a new one. In such case the contract must be proved partly by the written and partly by the subsequent oral contract which has thus been incorporated into and made a part of the original one.

10. WORKING CONTRACTS—*Abrogation of Original Contract by Changes and Alterations—Stipulation in Contract.*—No express provision in a building contract reduced to writing that changes may be made without abrogating the contract is necessary in order to authorize changes by mutual agreement of all parties being made without that effect. Such a provision is necessary to avoid such effect only where the changes are made by one of the parties without the consent of the other.

11. WORKING CONTRACTS—*Instructions—Whether Specifications Part of Contract.*—Where in an action by contractors against landowners for the cost of remodeling buildings, there were some controverted questions with respect to what items of the work done were covered by the original contract, which the specifications covered, but which the plans did not cover, the jury should have been instructed with respect to the practical bearing the fact that the specifications were or were not a part of the contract had on their verdict, so that they might have had that subject in mind in arriving at their verdict, and have ascertained what the fact was in respect to that matter, the evidence being conflicting as to whether the specifications were considered by the parties as forming a part of the contract.

12. WORKING CONTRACTS—*Changes and Alterations—Determination of Liability of Owners.*—Under a building contrct for remodeling a building owned by several, the maximum cost was limited to $21,000. The contract was only signed by one of the owners, and there was no evidence tending to show that they authorized the owner who signed the contract to bind them for a greater sum than $20,000. Numerous additions, alterations and omissions were made in the plan during the progress of the work, and the liability of the owner signing the contract should be determined by deducting from the original contract price the reasonable saving of expense to the contractors due to the omissions, and adding the reasonable expense to the contractors incurred for the additions and alterations.

13. JOINT TENANTS AND TENANTS IN COMMON—*Tenant in Common Binding Cotenants.*—Under ordinary circumstances, neither tenant in common can bind the estate or person of the other by any act in relation to the common property, not previously authorized, or subsequently ratified, for co-tenants do not sustain the relation of principal and agent to each other, nor are they partners, and the rule which prevents them from binding each other applies with greater force after expiration of the cotenancy; a contract by one tenant in common in relation to the whole estate being voidable at the election of his cotenants not joining in said contract. But the contracting cotenant may himself be bound. Even where some previous authority or agency is conferred upon a tenant in common, his acts must be strictly within the authority; third persons dealing with a tenant in common being bound at their peril to ascertain his authority to bind his co-owners.

14. WORKING CONTRACTS—*Tenants in Common—Contract by One Cotenant.*— None of the owners of a building could bind the others to any agreement, express or implied, with contractors for remodeling a building, merely because of their relationship as co-owners.

15. WORKING CONTRACTS—*Acceptance of Work—Use and Enjoyment of Building.*—The use and enjoyment of one of a building erected on his land rests upon a different footing from the acceptance of a chattel, in so far as concerns the implied promise which the law will

supply in the respective cases. The mere acceptance, use and enjoyment of a building after completion is a circumstance to be considered; but it is not, in itself, either conclusive or presumptive evidence of acceptance, in the true meaning of that word. This does not mean, however, that the taking possession of a structure, without objection to its construction, may not, under some circumstances, amount to such an acceptance of the work and materials that the law will imply a promise to pay therefor on a *quantum meruit* or *quantum valebat.*

16. WORKING CONTRACTS—*Acceptance—Necessity—What Amounts to Acceptance.*—When a contract for erecting a building has not been so performed that a recovery can be had thereon, a recovery in assumpsit upon the common counts for work and materials furnished in the erection will only be permitted when the owner has actually accepted the building erected; the mere fact that the edifice adds value to the land on which it stands is not enough. Such acceptance by the owner may be express or implied from his conduct. The mere occupancy of the building is not enough to show such acceptance.

17. EXPERT AND OPINION EVIDENCE—*Cross-Examination—Question to Expert as to His Business Success.*—In an action by building contractors against landowners, a witness for the owners testified, as an expert, to the expense of omissions and additions in the work. On cross-examination he was asked and allowed to answer a question as to whether he was successful in business.

*Held:* That the question was too broad in its scope to be properly admissible. The question should have been confined to the inquiry as to whether the witness had previously made any serious mistake in such estimates as those about which he had testified.

18. WORKING CONTRACTS—*Witnesses—Cross-Examination—Reputation of Subcontractors.*—In an action by contractors against landowners, a witness was asked on cross-examination, over the objection of the owners, and was allowed to answer questions as to what was the business reputation and standing of a number of the subcontractors, who furnished labor and materials for the work in controversy. The business reputation and standing of these contractors was not in issue in the case, as an original proposition, and no effort had been made by the owners, by cross-examination, or otherwise, to impeach such reputation, so as to put it in issue. Therefore the questions under consideration and the answers thereto were inadmissible in evidence.

Error to a judgment of the Corporation Court of the city of Newport News, in a proceeding by motion for a judgment for money. Judgment for plaintiffs. Defendants assign error.

*Reversed and a new trial granted.*

This is an action by notice of motion instituted by the defendants in error. (who will be hereinafter referred to as the contractors) against the plaintiffs in error, Warren, Barnes, W. S. Greene and Minnie E. Greene, his wife (who will be hereinafter referred to by their individual names or as owners), seeking to recover the sum of $16,619.58, with interest, being the alleged balance due the contractors on an account attached to the notice of motion, which account contains the alleged cost, plus ten per cent., of the materials furnished and labor done by the contractors for the said owners in the remodeling a certain building known as the Gloucester Apartments, owned by and located on a certain lot belonging to the said owners.

The jury found a verdict for the contractors for the sum of $12,778.78, in accordance with which the judgment under review was entered and the owners bring error.

The assignments of error concern the action of the trial court in the admission of certain evidence, in the giving and refusing of certain instructions and in the refusal to set aside the verdict as contrary to the law and the evidence.

According to the evidence there was first a writing of date August 16, 1919, which consisted of a proposal and conditional acceptance, as follows:

"Newport News, Va. (August 16, 1919).

"Messrs. J. E. Warren and W. S. Green,

Newport News, Virginia.

"We hereby porpose and agree to furnish all necessary material and labor for the remodeling of your building, 29th street and West avenue, subject to the following exceptions:

"Omit large front columns which are shown on plans.

"Omit first and second floor French doors, leaving the present windows.

"Use all old material that is good and balance to be removed by builders.

"Front and side porch to be red cement lined in squares so as to resemble tile.

"Balance of work to be completed according to plans at cost plus ten per centum (10%), finished cost, including our ten per centum, not to exceed twenty-one thousand ($21,000.00) dollars.

"Payments every thirty days according to progress of work.

"Final settlement upon completion.

"REMARKS.

"The following items are included in this contract according to agreement:

"Brick and cement work.

"Lumber and mill work.

"Plumbing and heating.

"Lath and plaster (use all old laths where possible).

"Interior and exterior painting.

"Electric wiring (fixtures not included in this contract).

"Roofing and spouting.

"Screens and doors.

"Hardware (new hardware for all doors).

"Labor.

"Fire escape.

"Work to be started in about ten days from date of acceptance, and completed in a thorough, workmanlike manner.

>"Goodrich Strip and Screen Company,
>         "By E. M. Goodrich.

"Accepted:—Upon condition that E. F. Piland personally signs contract.

"J. E. Warren.

"Dated:—Aug. 16, 1919."

It will be noted that this writing, after providing for certain omissions, stipulated as follows: "Balance of the work to be completed according to plans," etc., nothing being said about specifications.

The evidence shows that, before this writing became a contract by the signature of Piland, which was required by the conditional acceptance of the proposal signed by Warren, specifications were furnished the contractors by Warren, but the evidence is conflicting on the question of whether the specifications were at the time or thereafter mutually considered by Warren and the contractors as forming a part of the contract.

The specifications contained, among other things, the following provision:

"The owner may, without invalidating the contract, make changes by alterating, adding to or deducting from the work    *    *."

The specifications contained some other provisions with respect to material to be furnished and the work to be done in connection therewith, which the plans, from their very nature, could not, and did not show, and which the proposal in writing aforesaid did not specify.   These items, however, are not large in number or in amount as affecting the controversy between the parties.

Piland, on August 25, 1919, signed the provision which completed the written contract, which provision, appearing at the foot of the proposal and just below the signature of Warren, is as follows:

"Aug. 25, 1919.   I agree with the above, it being

understood owner furnishes ripsawed flooring, and will
personally sign contract.

"E. F. Piland."

None of the owners signed the contract except
Warren, whose signature was given as appears above.

Meanwhile, between August 16th and the .25th,
some little work was done by Goodrich, one of the
contractors, under the expectation that the proposal
would be signed by his partner, Piland, so as to com-
plete the contract, and after Piland did sign as afore-
said, the work under the contract proceeded.

The uncontroverted evidence, however, disclosed
that the owners, Barnes, W. S. Greene and Mrs.
Greene, authorized Warren to obligate them to pay
the contractors only the amount of $5,000.00 each,
that is, one-fourth each of the total sum of $20,000.00,
which it was understood between the owners was to
be the limit of the outlay which Barnes, Greene and
Mrs. Greene agreed to make for the remodeling of the
building. It also appears from the evidence as an
uncontroverted fact that, before the contractors did
anything under the contract aforesaid, they were
expressly informed that Barnes, W. S. and Mrs.
Greene had the agreement with Warren just mentioned
and that the limit of the obligation of the three former
parties to the contractors under the contract was
$5,000.00 each. To this the contractors assented.
It appears that while the contract imposed a limit of
$21,000.00 on the contract price, the owners, other
than Warren, supposed at the time that the limit
mentioned in the contract was $20,000.00; and it
does not appear from the evidence that Barnes or
Mrs. Greene knew that the limit was $21,000.00,
until after the work was completed, or that W. S.

Greene knew of this, until some time after the contract was executed and the work had been partly done under it.

W. S. Greene's testimony on this subject, which is uncontradicted by any witness, was as follows:

"Before the work began witness had a conversation with Goodrich and emphasized the fact that every dollar he had was in that building, and cautioned him to do a good job and not to exceed the contract price, to which Goodrich replied that he understood that. Witness told Goodrich that he had an agreement with Warren, that the work would not exceed twenty thousand dollars. Goodrich stated that there would be no trouble about that at all, and it may cost a little less than that. Witness told Goodrich that he and his wife could not participate in an expenditure of more than $20,000.00."

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

"All checks to the contractors were signed by Warren and countersigned by me. Every time a check was delivered witness called Goodrich's attention to the fact that his limit was $20,000.00, and told him not to exceed it. One day Goodrich called witness's attention to the fact that the contract price was $21,000.00, which was unknown to witness at the beginning of the work. Witness then saw Warren about the matter and found that this was a fact. When Warren made the last payment of $1,250.00 he made it from his personal fund."

Barnes' testimony on the same subject, which is likewise uncontroverted, is as follows:

"About the middle of August, 1919, witness met Goodrich at the baseball park, and he said 'well, I got it.' Witness thought that Goodrich was interested only in putting screens in buildings, and inquired of

him what he meant, to which Goodrich replied that he had gotten the contract to remodel the Gloucester apartments, for twenty thousand dollars. Witness then asked whether Goodrich had guessed at the amount, or did he know what amount the owners had appropriated for the work. Goodrich answered that was his price and his bid on the work. Witness told him that that was his limit, and not to exceed the contract price of $20,000. Witness did not know that the contract price was raised to $21,000.00."

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"As to the conversation with Mr. Piland, witness said that he saw Piland at the ball park one day, when the latter said to him, 'Mr. Barnes, that job is now completed and we would like to have our money.' Witness expressed surprise at this, and stated that the money to pay for the work had been provided for before the work had been begun. Witness stated that what he had in mind was the twenty thousand dollars. He then said he would see Mr. Warren about the matter, and did see him the next day and wanted to know why the contractors had not been paid for their work. Warren answered that he had paid them practically everything that was owing, but that the contractors had presented a large bill for extras, which he did not think a proper charge. This was the first time the witness knew that a bill for about thirty-seven thousand dollars had been presented. Witness afterwards saw Piland and communicated to him his conversation with Warren, and asked Piland why he did not follow the plans and specifications, to which Piland replied that the extras were for changes made in the work by Mr. Warren. Barnes told him that he knew nothing about any changes other than the front porch columns. Witness was astonished at

the amount claimed, and expressed surprise to Piland that the bill was almost twice the contract price."

The conversation with Mr. Piland referred to in the quotation last made was a conversation relied on by the contractors to evidence the admission on the part of Barnes of his obligation to pay the whole of the claim of the contractors sued for. Piland's testimony as to this conversation is directly in conflict with the testimony of Barnes, above quoted, on the subject of this conversation, and was to the effect that, after the remodeling of the building was completed and the contractors had rendered their account for the amount subsequently sued for (which was nearly $37,000.00 total, subject to $20,287.58 credits for payments made them), the following occurred:

"Mr. Barnes called me up over the telephone a few days afterwards, and made some remark, that I don't care to repeat, as to Mr. Warren, and said he thought it was a just account and he would see that I got every cent of my money.

"Q. Mr. Barnes said that?

"A. Yes.

"Q. To Mr. Barnes?

"A. Mr. Barnes called me, and asked me to meet him out at the ball park. I went out to the game that afternoon, and Mr. Barnes was busy when the game was over, and I could not see him; and he called me over the telephone after he got home, and after I had gotten home—probably six or seven o'clock—and we had a conversation with reference to the account.

"Q. My sole question was whether you mentioned the amount of your bill to Mr. Barnes?

"A. Yes, I did. I looked up estimate and gave him the correct amount, and looked at the books and gave him the correct amount."

The work of remodeling the building, begun, as aforesaid, in August, 1919, under the written contract, was not completed until about April 1, 1920. When the work was completed the owners took possession of the building, W. S. Greene and wife going into and occupying certain apartments in it, and some, if not all, of the other rooms in the building were rented out by the owners to tenants.

The uncontroverted evidence is that beginning in October, 1919, the price for material and labor involved in the contract rose rapidly and had increased, before the work was completed, over 100 per cent. over the prices prevailing when the contract was entered into. It appears that, with the exception of about $9,000.00 expended for labor and lumber, the contractors had the material and labor furnished by subcontractors, who in most instances charged and were paid therefor on the basis of actual cost plus certain percentages, and the contractors added ten per cent. of the totals to all of these bills as being a profit they were entitled to recover. Only in a few instances, of comparatively minor amounts, did the contractors protect themselves by making binding contracts with subcontractors, and it seems that they did not protect themselves by purchasing any lumber or contracting for any labor, before the prices rose. In a number of instances, but not in all, they obtained estimates before entering into the contract with the owners from those who afterwards became subcontractors, but the estimates were not binding on such subcontractors. The result of this was that as the contractors proceeded with the work they were compelled to pay the actual market prices, which were continually increasing prices, for the material and labor needed, with the exception of the comparatively few instances in which they had binding

contracts with their subcontractors made before the contract with the owners was entered into. And, instead of furnishing all of the material and doing all of the work themselves, they in large part let the work to subcontractors on a cost plus percentage basis, and, as aforesaid, added their claimed ten per cent. profit to this cost. The evidence does not disclose whether it was within the mutual contemplation of the parties that this should be done. It seems, however, to have been a concessum in the trial of the case, and, indeed, appears from the testimony for the owners, that as of the times that the material and labor, not covered by the few and small binding contracts with the subcontractors, were furnished, the prices which the contractors paid, of actual cost plus certain percentages, were as low as could then have been obtained and were, therefore, reasonable prices as of such times.

By mutual agreement the services of any architect in the supervision of the work, etc., were dispensed with, and it was understood and agreed between Warren and the contractors, that Warren was to act for the owners in the supervision of the work.

In the progress of the work a number of changes of construction were directed to be made by Warren, and a few by W. S. Greene, all of which were made by the contractors without any objection or express claim made at the time, that they were extras, or that the original contract was or would be abrogated by the changes or any of them, although in some instances of changes directed by Warren the evidence tends to show that Warren conceded at the time that they were extras, and some of them, such as removing shade trees, fences, old pavement, and certain additions to the building not covered by the plans, were conceded

on the trial to be extras; but the owners claimed on the trial that there were certain omissions from the material and work required by the plans, mentioned in the contract, which, in the progress of the work, were omitted by the mutual consent of Warren and the contractors, in order to lessen the expense of the work (about which consent no question was made on the trial by the contractors), which as claimed by the owners lessened the expense to the contractors to an amount in excess of the extras, so that the owners by reason thereof were entitled, as they claimed, in any aspect of the case, to a credit therefor on the $21,000.00 maximum contract price, which, together with the payments conceded by the contractors to have been made to them, left a balance owing the contractors of only $520.40 of the $21,000.00 maximum contract price.

It was also claimed by Greene and wife and Barnes that they, in no aspect of the case, were liable beyond their one-fourth each of the maximum price of $20,000.00. Greene, in his testimony, claimed, in substance, that his directions of changes were made with that express understanding on the part of the contractors as well as of himself; that he ratified and approved of the other changes only upon that mutual understanding. There was no testimony in the case tending to show that Mrs. Greene acted upon any other basis than such a mutual understanding. And Barnes denied that he directed any changes or that his conduct was at any time inconsistent with his claim that he acted upon such mutual understanding.

On the other hand the contractors claimed on the trial that, while it was true that they started off with a written contract, under which they were to furnish the material and do the work, with a limitation upon

the entire cost to the owners of $21,000.00, yet, from the very inception of the work and along during its progress, the owners, through the direction of Warren for the most part, and some through the direction of W. S. Greene and Barnes, made, with the assent of the contractors, such radical changes in the building that "only a very small part" of the original contract remained unaltered, so that, as claimed by them, the contractors had a right of action upon a parol contract for the whole work, on which they were entitled to recover upon the basis of a *quantum meruit* for the value of the materials furnished and labor done for the owners.

There is some conflict in the evidence as to the number of the changes in the construction as actually made, as compared with the construction provided for in the written contract, but not much real conflict. There is no conflict in the evidence as to the character of these changes.

The contractors introduced no evidence to show that the building was so materially changed that it could not be reasonably recognized as the same building or work embraced in the written contract; that is to say they introduced no evidence to show that in the progress of the work the plans covered by the written contract were so entirely abandoned by the additions or omissions that it was impossible to trace the work provided for in the written contract and say to what part of the work the written contract applied and what part was extras and not covered by that contract; whereas the owners introduced express testimony to the effect that the building was not so changed. On the subject of the changes in the construction as provided for in the written contract the evidence for the contractors went no further than tending to show that

the changes were very numerous and frequent and that it would have been extremely troublesome to have kept an account of the extra expense occasioned by the changes. Indeed the testimony for the contractors shows affirmatively that much of the work was in accordance with the requirements of the written contract, and that it was known to the contractors at the time, when each of these changes were made and assented to by the contractors, what each and all of such changes were, and that the contractors could have kept their books so as to have shown what was the extra expense to them thereby occasioned; but that they did not, and made no attempt to do so. That they kept their books so as to show merely the actual expense to them of all of the material and work as the construction progressed, without making any distinction between what was in accordance with the written contract and what was occasioned by the changes, and that, speaking from the books as they were kept, it was impossible for them to say what was the extra expense occasioned by the changes. The contractors, however, filed in evidence a statement of the various changes of omissions from and additions to the work as required by the written contract, as claimed by them, which goes into great detail in its items, but no valuation is placed upon the different items. In the testimony for the contractors on the trial the extra expense to the contractors of some of these items are stated; but no attempt was made in the evidence for the contractors to show what was the extra expense to them of all the changes in additions, after giving credit for the benefit of the omission. They contented themselves with resting the case, upon this feature. of it, upon the position that the changes were so numerous and frequent that they abrogated the written contract by mutual assent of the parties.

The court gave the following instructions, Nos. 1 and 2 for the contractors and A, B, C, and D, for the owners, the italicised portion of instruction C, being added by the court below over the objection of the owners:

## "INSTRUCTIONS FOR PLAINTIFFS.

"1. The court instructs the jury that even though they may believe from the evidence that some of the defendants, being the owners of the apartment house in question, did not expressly authorize the plaintiffs to furnish the labor and materials and do the work in question, that still if they stood by in silence and saw the work done and materials furnished for work upon the premises in question belonging to them, and of which they have received the benefits and which they afterwards have accepted and enjoyed, that the law will imply a promise on the part of said defendants to pay the value of said work and materials, unless the jury believe from the evidence that the original written contract was not abrogated.

"2. The court instructs the jury that if they believe, from the evidence, that the contract between the plaintiffs and the defendants was so departed from, whether by additions, omissions or alterations, by the direction of the defendants or their duly authorized agent, so as to make it impossible to calculate the effect upon the contract price, whether by way of increasing that price or decreasing that price, then they shall find that the contract was abrogated, and that the defendants have accepted the building as remodeled by the plaintiffs, then the plaintiffs are entitled to recover against the defendants a sum the jury shall say represents a reasonable value of the work done and materials

used by the plaintiffs in thus remodeling the said building, including a reasonable sum for profits, less any payments made by the defendants on account."

### "INSTRUCTIONS FOR DEFENDANTS.

"A. The court instructs the jury that the mere fact that alterations and changes were made in the original plans for the building is not sufficient to show an abandonment or rescission of the original contract, unless the jury believe from the evidence that such original contract was changed in such material respect that the work done in and about the building could no longer be reasonably recognized as that originally contracted for.

"B. The court instructs the jury that when work is in progress on a building, pursuant to a contract in writing, and additions and alterations are made, the original contract, unless it be so thoroughly abandoned that it is impossible to trace it and to say to what part of the work it shall be applied, still exists and is binding on the parties as far as it can be followed.

"And if the jury in this case believe that the original contract was not abandoned within the foregoing rules, then, in arriving at their verdict, the jury should add to the sum of twenty-one thousand dollars ($21,000.00) the price of the ripsawed flooring and the increased cost, if any, of the additions or alterations.

"Due allowance shall also be made for any work or material omitted by agreement of the parties.

"C. The court instructs the jury that while a contract may be rescinded and terminated by mutual agreement of the parties, the evidence must be clear and satisfactory to show such agreement, *which evidence may be direct or implied from the acts of the parties.*

"D. The court instructs the jury that if they believe from the evidence that the contract of August 16, 1919, remained in full force and effect, then there can be no recovery for the reasonable value of the work and materials covered by the said contract of August 16, 1919, but the price stipulated in said contract is controlling."

Other matters are referred to in the opinion of the court.

*Lett & Massie* and *J. Winston Read*, for the plaintiffs in error.

*Nelms, Colonna & McMurran*, for the defendants in error.

SIMS, J., after making the foregoing statement, delivered the following opinion of the court:

So far as deemed necessary, the questions presented for our decision by the assignments of error will be disposed of in their order as stated below.

[1] 1. Did the court err in giving instruction No. 2, in that the standard it set up, by which the jury was to ascertain from the evidence whether the written contract was wholly abrogated, was erroneous in this, that the jury were thereby instructed that they should find that ʼthe contract was abrogated if they believed that the additions, omissions or alterations made by the direction of the owners, or their duly authorized agents, so departed from the contract as to make it impossible to calculate the effect upon the contract price?

This question must be answered in the affirmative, for three reasons:

First: Because there was no evidence whatever before the jury tending to show that the changes in question so departed from the contract as to make it

impossible, if the facts had been fully shown in evidence, to calculate the effect upon the contract price. The very testimony for the contractors which was introduced on this subject showed that the contractors knew, at times the changes were directed, just what the changes from the plans covered by the contract were, in the utmost detail; that such plans were not wholly changed; and that, if the contractors had kept their books accordingly, there was no impossibility in their having had their books show precisely what expense to them, over and above the contract figures, if any, was occasioned by the changes. Indeed, the evidence for the contractors, consisting of the statement, filed by them in evidence, of all of the changes, both of additions and omissions from the contract plans, as claimed by them, and the testimony for them of the extra expense of some of these changes, demonstrates that there was no impossibility which prevented their introducing testimony before the jury showing the effect upon the contract price of all of such changes, notwithstanding the fact that their books had not been so kept as to show this. The record indicates that the contractors did not introduce such evidence to the extent of covering all the items in the statement filed by them as aforesaid, merely because they preferred to rely upon the position that the contract was wholly abrogated by the aforesaid changes.

[2, 3] Second: The standard in question, set up by the instruction, was erroneous, in that it was too vague and indefinite to serve as a proper guide to the jury upon the question in issue. The impossibility mentioned was not limited by the terms employed, and hence consisted of no impossibility whatsoever. Under such an instruction an impossibility on the part of the jury to calculate from the evidence before them the

effect upon the contract price occasioned by the changes aforesaid, would have warranted them in finding the written contract abrogated. Such could not be the law, for it would offer a premium to a plaintiff in such situation to omit to prove his case.

[4, 5] Further: It is well settled what the correct standard is, in such case, by which to determine whether the special contract has been abrogated by subsequent changes, mutually agreed upon, in the construction of the building, differently from what was provided for in the contract, and that is this: To abrogate the contract the building must be so materially changed by such deviation from the contract that it cannot be reasonably recognized as the same building, or work, as that provided for in the original contract. That is to say, to abrogate the special contract, the plans covered by it must have been so entirely abandoned by the additions or omissions as to make it impossible to trace the work, provided for in the contract, and to say to what part of the work the contract applied and to what part it did not. 6 R. C. L., sec. 298, p. 914; 9 C. J. 722; *Bozarth* v. *Dudley*, 44 N. J. Law, 304, 43 Am. Rep. 373.

As said in 6 R. C. L., sec. 298, p. 914: "When a building is in process of construction, and additions or alterations are made, the original contract, unless it be so entirely abandoned that it is impossible to trace it and say to what part of the work it shall be applied, is held still to exist, and to be binding on the parties so far as the work can be followed. The additions or alterations, if the expense of the work is thereby increased, may be the subject of a new contract, either express or implied, but they do not affect the original contract, which still remains in force."

As said in 9 C. J. 722: "Where  *  *  the original

contract is deviated from in material respects, so that the work cannot reasonably be recognized as that originally contracted for, the original contract should be treated as abandoned."

As said in *Bozarth* v. *Dudley, supra:* "Any contract may be abrogated or abandoned by the express agreement of the parties who made it. An abandonment may be implied also from the acts of the parties, as, for example, if upon the site upon which a building **was to be** erected under a written contract, the owner should direct the builder to erect a building entirely variant in character, shape, material and style."

[6] Instructions A and B, given by the court, correctly stated the law on the subject of the abrogation of the original contract. Instruction No. 2, if intended to set up the same standard as instructions A and B, by which the jury were to determine whether the contract was abrogated, was not properly phrased so to do; especially is this so when the instruction is read in the light of the only evidence introduced by the contractors on the subject of the "impossibility" mentioned therein; and being complete in itself, in that it directed a verdict, the defect was not cured by instructions A and B.

[7] Third: Instruction No. 2 was erroneous for the reason that there was no evidence to support it on the subject of the entire abrogation of the original contract, of the clear and convincing character which the law in such case requires.

Where the deviations from the original contract, which are relied on as having wholly abrogated the contract, are made by mutual consent, the law is that for the deviations to have that effect—the mutual intention that they shall have that effect—"must be apparent or clearly shown by implication." 30 Am.

& Eng. Encyc. of Law (2d ed.), p. 1211. That is to
say, there must be clear, unequivocal and convincing
evidence, direct or implied, of such intent, on the part
of the owner, as well as of the contractor, before such
effect ensues.

[8] There is, in the case in judgment, an entire
absence of any evidence tending to show that what
the owners did; even Warren, whose conduct in direct-
ing changes was more extreme than that of any other
owner, was not entirely consistent with the intention
not to abrogate the original contract further than
was occasioned by the changes which were made by
the mutual consent of Warren and the contractors;
and merely to ask for certain omissions, which would
have the effect of reducing the total expense, and for
certain additions, which would be extras, and have the
effect of increasing the expense, the obligation being
upon Warren of personally paying the contractors out
of his own pocket whatever might be the excess, if
any, of the total expense to the contractors over and
above the price of $20,000.00, which was occasioned
by such changes, after due credit was allowed for the
omissions. That this is a correct view of the evidence
becomes more apparent when it is considered that the
uncontroverted evidence discloses that all of the omis-
sions and additions aforesaid were assented to by the
contractors, without the position being taken by them
or either of them, at any time before the completion
of the work, that the original contract would be en-
tirely abrogated because of those changes. Indeed it
appears from the statement of counsel for the con-
tractors during the trial of the case, that not even
upon the trial was the position taken by the con-
tractors that the original contract had been entirely
abrogated by the changes. The statement of counsel
on the trial referred to is as follows:

"I want to say this, your Honor, in regard to our position in this matter: My friend is absolutely correct that we start off with a written contract. The terms of that contract are specific—namely, that we will do certain work for a certain agreed price; or, in other words, we will do that work at the actual" (something here omitted), "to the defendants, plus ten per cent., with the understanding that the entire cost to the defendants for that particular work shall not exceed $21,000. We have just started on the line of evidence, which I hope to develop later in the case, to the effect that when we started on that specific work, from its very inception, there were made changes in that contract, so that at the end, when the work is finally completed and accepted by these defendants, is no more the contract *than a very, very small part of it*, by reason of the changes made, and that the written contract has been swallowed up on the parol contract growing out of these various changes that have been made during the prosecution of the work. We, therefore, find ourselves in the position that these things are so interwoven that you can't tell where the old contract starts and the new contract begins; and in a case of that kind the authorities are amply on the point that *you prove your contract as modified, and that is the contract in the case    *    *.*" (Italics supplied.)

This statement, in its conclusion, is, in substance, a correct statement of the only contract of which there is any evidence in the record before us—namely, the original contract in writing as modified by the changes in construction made by mutual consent, as aforesaid. This being so, it is manifest that the instruction under consideration was misleading on the subject of the abrogation of the original contract; the result being to authorize the jury to find that the contract

had been wholly abrogated, when there was no evidence before them on which such a finding could be properly based.

The quotations from the authorities and what we have said above, upon the subject under consideration, are applicable to cases in which the deviation from the original contract requirements are made by parol and by mutual consent of all the parties to such contract, so that that contract is not regarded as remaining open and unperformed. Deviations not mutually consented to, or made under special contract entered into, subsequently to the original special contract, involve other principles.

[9, 10] 3: This being a case of mutual consent to changes in the original contract requirements, whether the specifications formed a part of the original contract in the case in judgment is not, as we think, a material question, as bearing upon the further question of whether such contract was abrogated.

As said in 6 R. C. L., section 298, pp. 914-15:

"It is true that a simple contract completely reduced to writing cannot be contradicted, changed or modified by parol evidence of what was said and done by the parties to it at the time it was made, because the parties agreed to put the contract into writing and to make the writing part and evidence thereof. The very purpose of the writing is to render the agreement more certain and to exclude parol evidence of it. Nevertheless, by the rules of the common law, it is competent for the parties to a simple contract in writing, before any breach of its provisions, either altogether to waive, dissolve, or abandon it, or add to, change, or modify it, or vary or qualify its terms, and thus make a new one. In such case the contract must be proved partly by the written and partly by

the subsequent oral contract which has thus been incorporated into and made a part of the original one.''

It follows that no express provision in a building contract that changes may be made without abrogating the special contract is necessary in order to authorize changes by mutual agreement of all parties being made without that effect. Such a provision is necessary to avoid such effect only where the changes are made by one of the parties without the consent of the other. See to same effect 9 C. J. 717 et seq.

The specifications, indeed, contained the specific provision that the owners might, ''without invalidating the contract, make changes by altering, adding to or deducting from the work.'' As held in *Bozarth* v. *Dudley, supra* (44 N. J. Law at p. 307, 43 Am. Rep. at p. 375): ''* * * the jury * * * were told that since the contract provided for deviations and changes of plan, they could not properly draw the conclusion that the contract was abrogated merely from such deviations and changes;'' and this was held to be a correct instruction. But since, as we have seen, an express stipulation is not necessary to be made in a building contract in order to authorize changes of plan by the owner without invalidating the original contract, where the contractor assents to such changes, when such changes have been made by mutual consent, it is just as if they had been made by direction of the owner under an express stipulation in the parol contract permitting him to so direct. So that in the case in judgment the instruction under consideration, if proper to have been given at all, should have contained a further provision to the effect that, as there was no controversy as to the fact that the changes were assented to by the contractors, the jury could not properly draw the conclusion that the contract was

wholly abrogated merely from the fact that the changes were made.

[11] 4. It should be noted, however, that as there were some controverted questions in the case, with respect to what items of the work done were covered by the original contract, which the specifications covered, but which the plans, from their very nature could not and did not cover, the jury should have been instructed with respect to the practical bearing the fact that the specifications were or were not a part of the contract had on their verdict, so that they might have had that subject in mind in arriving at their verdict, and have ascertained what the fact was in respect to that matter.

It results from what has been said that a new trial will have to be awarded.

[12] 5. On a new trial the liability of Warren will have to be ascertained, first, by deducting from the original contract price of $21,000.00, plus the expense of the ripsawed flooring, the reasonable saving of expense to the contractors due to the omissions, aforesaid, at the times they were made, which will fix what must be regarded as the contract price so far as Warren is concerned; next, by finding what was the reasonable expense to the contractors incurred for the additions, aforesaid, at the times they were made, and for this Warren should be held liable to the contractors, in addition to the contract price fixed as aforesaid; subject, of course, to proper credit for the payments which have been made.

The liability, or nonliability, of the other owners, to be ascertained upon a new trial, involves more complicated problems. None of them executed the written contract; and there is no evidence tending to show that they authorized Warren to execute it, so

as to obligate them for a greater maximum price than
$20,000.00.    Whether the respective owners, other
than Warren, afterwards obligated themselves for any
greater price, depends on whether they ratified what
Warren did under such circumstances, or their own
conduct was such, in directing the changes in plans,
or in accepting the completed work, as that, under
the circumstances, it is just and equitable that they
should be liable to the contractors for a greater maxi-
mum price than $20,000.00.

[13, 14] As bearing on these questions, it must be
borne in mind that none of the owners could bind the
others to any agreement with the contractors, express
or implied, merely because of their relationship as co-
owners.

As said in 17 Am. & Eng. Enc. of Law (2nd ed.),
p. 672:

"Cotenants may, of course, render themselves
jointly liable to third persons by contracting jointly
in respect to the common property.    But one tenant
in common cannot bind his cotenant personally nor
by any unauthorized agreement or act in respect to
the common property.    There is no relationship exist-
ing between cotenants, as between partners, which
will render the acts of one cotenant respecting the
common property binding on the others.    No action
of one or more of several tenants in common can
impair the rights of the other cotenants."

As said in 38 Cyc. 101:

"Under ordinary circumstances neither tenant in
common can bind the estate or person of the other by
any act in relation to the common property, not
previously authorized, or subsequently ratified, for
cotenants do not sustain the relation of principal
and agent to each other nor are they partners and the

rule which prevents them from binding each other applies with greater force after expiration of the cotenancy. A contract by one tenant in common in relation to the whole estate being voidable at the election of his cotenants not joining in said contract. But the contracting cotenant may himself be bound. Even where some previous authority or agency is conferred upon a tenant in common, his acts must be strictly within the authority, *third persons dealing with a tenant in common being bound at their peril to ascertain his authority to bind his co-owners.*"    (Italics supplied).

[15, 16] And the following must also be borne in mind:

Both instructions No. 1 and No. 2, given by the court in the instant case, were erroneous in their reference to the effect of the mere acceptance, use and enjoyment of the building after completion, without some further explanation of what was meant thereby. Those instructions give too much effect to the mere naked occupation of the building after completion. That is a circumstance to be considered, but it is not, in itself, either conclusive or presumptive evidence of acceptance, in the true meaning of that word in such cases. The use and enjoyment of one of a building erected on his land, rests upon a different footing from the acceptance of a chattel, in so far as concerns the implied promise which the law will supply in the respective cases. Building contracts are different in this particular from contracts for chattels. The use of the terms "accepted" and "enjoyed the use and benefit" in such instructions as these under consideration, without further explanation of their meaning, is plainly misleading in such a case as that in judgment.

As said of building contracts, in *Bozarth* v. *Dudley*, *supra* (44 N. J. Law 304, 308, 309, 43 Am. Rep. 373, 376-7): "Such a contract deals with a subject matter of a peculiar nature. When an agreement for the manufacture of a chattel out of materials furnished by the maker is not performed according to its terms, the remedy of the party for whom it is made seems perfect. And the rejection of the chattel, while completely protecting him, does no injustice to the maker, for it leaves in his hands the materials with which his labor has been united. But when, under a contract for building, labor and materials of the builder are put into an edifice immovably fixed to the lands of another, and the title to which goes with such lands, the right of rejection, while it may seem theoretically to exist, is difficult to enforce in practice, without apparent injustice to one party or the other." The well considered and able opinion in that ·case thereupon proceeds to point out the different holdings of the courts in England and in this country, which the considerations mentioned have produced, under differing circumstances. The opinion thereupon continues as follows:

"The rule most agreeable to the principles governing contracts is, it seems to me, this: When a contract for erecting a building has not been so performed that a recovery can be had thereon, a recovery in assumpsit, upon the common counts for work and materials furnished in the erection, will only be permitted when the owner has accepted the building erected. The view that assumes acceptance from the mere fact that the edifice adds value to the land on which it stands, in my judgment unduly restrains the force of the contract of the parties, and deprives the owner of the right to reject an edifice not in substantial conformity with its terms   *   *   *.

"Such acceptance by the owner may be express or implied from his conduct. It seems well settled that mere occupancy of the building by the owner, while appropriate, is neither presumptive nor conclusive evidence of acceptance. The reason is obvious. The building belongs to the owner of the land on which it stands. As said by Lord Campbell in *Munro* v. *Butt,* * *, the owner cannot be appropriately said to take possession of the building, for he has not been out of possession of that which is thus affixed to his own land."

This does not mean, however, that the taking possession of a structure, without objection to its construction, may not, under some circumstances, amount to such an acceptance of the work and materials that the law will imply a promise to pay therefor on a *quantum meruit* or *quantum valebat*. *Atlantic & D. R. Co.* v. *Delaware Const. Co.*, 98 Va. 503, 37 S. E. 13. Silence, under such circumstances as reasonably misleads another to his prejudice, is conduct, from which the law will supply a promise, which will be as binding as if it had been put into words.

Touching the enquiry whether there is any liability on the part of the owners, respectively, other than Warren, and, if so, upon which, if not upon all of them, the instructions, upon a new trial should explain to the jury the peculiar features of the law above mentioned, which, otherwise, they are likely to overlook to the prejudice of the owners in such a case, and be so framed that the jury may be left at liberty, if the evidence shall warrant it, to return differing verdicts for or against the several owners.

There are two other questions which arose in the former trial, touching the admissibility of certain questions on cross-examination, which are the subjects

of assignments of error on the present appeal, which may arise on a new trial, and which, therefore, we will pass upon. They are as follows:

[17] 6. Brinson, a witness for the owners, testified, as an expert, to the expense of the omissions and additions aforesaid, and, on the subject of his qualification to testify as such an expert, testified that he had been engaged in the. building business for fifty years. On cross-examination he was asked, over the objection of the owners, and was allowed to answer, the following question, namely: "Were you successful in business?"

The question was too broad in its scope to be properly admissible. As asked it involved a diversion of the minds of the jury into too wide a field of immaterial contingencies and collateral issues. The question should have been confined to the enquiry into whether the witness had previously made any serious mistake in such estimates as those about which he had testified.

[18] 7. While another witness for the owners was on the witness stand, named Phillips, he was asked, on cross-examination, over the objection of the owners, and was allowed to answer questions as to what was the business reputation and standing of a number of the subcontractors, who furnished labor and materials for the work in controversy.

The business reputation and standing of these contractors was not in issue in the case, as an original proposition; and no effort had been made by the owners, by cross-examination, or otherwise, to impeach such reputation, so as to put it in issue. Therefore the questions under consideration and the answers thereto were inadmissible in evidence. *Reynolds* v. *Richmond, etc., Co.,* 92 Va. 400, 23 S. E. 770; Greenleaf n Evidence (15th ed.), s ec tions 54–5.

As aforesaid, a new trial will be awarded, but upon such trial the fact that the original contract has not been entirely abrogated shall be taken as concluded, and the trial shall be had upon all other questions which have arisen or may arise in the case.

*Reversed and a new trial granted.*