### Richmond

STANLEY'S CAFETERIA, INC.

V.

ALBERT ABRAMSON, ET AL., ETC.

September 9, 1983.

Record No. 810390.

Present: All the Justices.

*Rodney Sager (Monahan & Sager,* on briefs), for appellant.
*John M. Oakey, Jr. (Thomas S. Schaufelberger; McGuire, Woods & Battle,* on brief), for appellees.

POFF, J., delivered the opinion of the Court.

A lessee, contending that the terms of the lease contract had been modified, appeals from a judgment upholding the lease as written and awarding the lessor damages.

Atlantic Life Insurance Company, operating as Grace Street Parking, Incorporated (Atlantic), owned a building located on Grace Street in Richmond. In 1950, Atlantic leased a portion of the building to Hot Shoppes, Inc., for use as a restaurant. Paragraph 18, the utilities clause of the lease, provides:

> Except for the space heat to be furnished by Lessor as provided in paragraph 16 above, all utility services used or consumed by Lessee will be paid for by Lessee promptly as and when bills therefor become due, including (without limiting the generality of the foregoing) all fuel oil, gas, electricity, water and telephones used by Lessee in or on the demised premises. All of said utilities used by the Lessee shall be metered to it separately and Lessor shall be under no obligation to pay for any of said utilities.[1]

During the first 10 years of the leasehold, Hot Shoppes paid the bills for the fuel required to produce the steam used for cooking and dishwashing. In a May 6, 1960 letter addressed to Atlantic, Clyde Hurst, the restaurant's mechanical engineer, described the generator Hot Shoppes used for that purpose as a "safety hazard". Complaining that the generator "occupies considerable space that would be useful to us for other purposes", Hurst said that "[w]e would like to discontinue the use of this steam generator and purchase all our steam from you." Hurst offered to install the plumbing connections and a "condensate return meter" to measure the quantity of steam drawn from Atlantic's central boiler system in order to compute the monthly payments. "The present rate of billing . . . is satisfactory," Hurst wrote, and "[a]ll costs of the system will be borne by Hot Shoppes".

---

[1] The lease also contains language characterized as a waiver-disclaimer clause.

Although the record contains no reply to this letter, it appears Atlantic agreed to supply the steam, and Hot Shoppes removed its generator, installed the plumbing, and began using Atlantic's steam in June. In a second letter written in October, Hurst advised Atlantic that the meter had been installed in September and that "we would like for you to begin billing us accordingly." "You are presently billing us at a rate of 82 ½ cents per 1000#", Hurst said, and "the meter shows an average usage of about 1700# per day." Hurst suggested that "a back-charge is in order" for the steam supplied before the meter was installed.

In 1971, Atlantic sold its building and the lease to Southwestern Life Insurance Company (Southwestern), and in June 1976, Southwestern and Hot Shoppes (which had merged with Marriott Corporation) executed a "Lease Amendment". The amendment liberalized the lessee's right to sublease, substituted a fixed 35-year term for the renewal option contained in the 1950 lease, and increased the percentage of gross sales base upon which annual rental charges were computed. The parties agreed that "[i]n all other respects the Lease is ratified and confirmed."[2]

Hot Shoppes granted a sublease to Stanley's Cafeteria, Inc. (Stanley's), in July 1976. The new lessee agreed to "assume and be responsible for, the prompt and faithful performance . . . of, each and every obligation, covenant, and agreement which by the express terms and conditions of the [1950] Lease are the responsibility of . . . the Lessee".

By deed dated September 26, 1978, Southwestern conveyed the Grace Street building to Richmond Grace Street Associates, a Virginia limited partnership formed by Albert, Gary, Ronald, and Jeffrey Abramson (the Abramsons). Edward Tullar, the Abramsons' director of property management, arranged the purchase. Tullar was aware several months before closing that Hot Shoppes and Stanley's had been purchasing steam from the lessor at the same rate since 1960. Believing "[t]hat was contrary to the lease", Tullar hired a professional engineer to calculate the actual cost of the fuel oil consumed in producing the steam supplied to Stan-

---

[2] Southwestern had also attempted to negotiate an increase in the monthly steam payments the lessee had been paying since 1960, but Hot Shoppes refused and the lease amendment made no mention of the lessee's obligation under the utilities clause. Immediately following the ratification clause, however, the lease amendment provided: "It is expressly agreed . . . that the execution of this Lease Amendment by Southwestern . . . does not constitute a waiver of any past or future defaults under the Lease."

ley's. Based on that calculation and the meter readings, the Abramsons began billing Stanley's at an "actual cost" rate. Stanley's refused to pay the higher charges and continued to make monthly payments at the old rate. The Abramsons did not deposit Stanley's checks until after they had filed their motion for judgment. In an amended pleading, the Abramsons demanded payment of all costs "expended from October 1, 1978 through May 1980 . . . for fuel oil used on behalf of Stanley's for which the lease requires the plaintiffs to be reimbursed by Stanley's."

The trial court, sitting without a jury, heard evidence *ore tenus,* considered memoranda filed by counsel, and entered judgment awarding the Abramsons damages in the sum of $8,931.86 "for fuel expenses incurred through May 31, 1980".

Appealing from the judgment, Stanley's argues that the lessor and the lessee modified the lessee's obligation under the utilities clause of the lease; that all successors in interest were aware of, acted pursuant to, and were bound by the modification; that Stanley's fulfilled its obligation as modified; and that the trial court erred in awarding the Abramsons damages based upon the terms of the 1950 lease.

Contracting parties may, of course, modify the terms of their contract by express mutual agreement. Stanley's contends that the letters the former lessee wrote to the lessor in 1960 are proof that the parties "reached and mutually assented to an acceptable accommodation" and that this accommodation amounted to "a clear modification to the existing written lease." Stanley's offered no evidence of bilateral commitments to such effect, and the import of the unilateral correspondence upon which it relies does not support the conclusion it urges.

From that correspondence, we learn only that the lessee proposed to buy the steam and condensate required in the operation of the restaurant from the lessor, that "[a]ll costs of the system will be borne by [the lessee]", that the lessor was "presently billing [the lessee] at a rate of 82 ½ cents per 1000#", and that "[t]he present rate of billing . . . is satisfactory." We fail to see how this language reflects a mutual agreement to fix the billing rate for the duration of the leasehold. In our view, the lessee's offer to bear "[a]ll costs of the system" was not only a reference to the costs of installing the meter and plumbing connections but also a recognition of the lessee's obligation under paragraph 18 to pay the costs of "all utility services [exclusive of space heat] used

or consumed by Lessee". And the lessee's use of the words "presently" and "present" was further acknowledgment that, under the cost formula, the rate of billing would be variable.

Finding no evidence of an express modification of the utilities clause, we turn to Stanley's theory of implied modification. Stanley's argues that "modification of a contract may be [inferred] from the conduct of the parties". For a period of 18 years, the lessee made and the lessor accepted monthly payments at the rate referenced in the 1960 correspondence. Such conduct, Stanley's says, "is sufficient to modify a prior inconsistent lease provision".

We agree that a course of dealing by contracting parties, considered in light of all the circumstances, may evince mutual intent to modify the terms of their contract. *See Kent* v. *Kent*, 2 Va. Dec. 674, 678, 34 S.E. 32, 33 (1899). And we accept Stanley's contention that all successors in interest with knowledge of such a modification may be bound thereby unless they agree otherwise. *See* Code §§ 55-217, -218. But the circumstances surrounding the conduct of the parties must be sufficient to support a finding of a "mutual intention" that the modification be effective, *Warren* v. *Goodrich,* 133 Va. 366, 388, 112 S.E. 687, 694 (1922), and such intention must be shown by "clear, unequivocal and convincing evidence, direct or implied", *id.* at 389, 112 S.E. at 694. And when one party claims that the other party has surrendered a right guaranteed by the contract, the party asserting such modification must prove either passage of valuable consideration, estoppel *in pais,* or waiver of the right. *See Atlantic Coast Line* v. *Bryan,* 109 Va. 523, 65 S.E. 30 (1909).

We find no *quid pro quo* for the surrender of the lessor's right to enforce the provisions of the utilities clause, and Stanley's, lacking proof of detriment sustained in reliance upon the lessor's conduct, cannot invoke the doctrine of estoppel.[3] The question, then, is whether the evidence is sufficient to show modification by waiver.[4]

---

[3] "In order for there to be an estoppel by conduct, the party sought to be estopped must have caused the other party to occupy a more disadvantageous position than that which he would have occupied except for that conduct." *Atlantic Coast Line* v. *Bryan,* 109 Va. at 526, 65 S.E. at 31.

[4] Responding to Stanley's theory of implied modification, the Abramsons rely, in part, upon the waiver-disclaimer clauses in the 1950 lease and the 1976 lease amendment. In the view we take of this case, we need not consider what effect those clauses may have.

As distinguished from estoppel, waiver is an *intentional* relinquishment of a known right. "In waiver, both knowledge of the facts basic to the exercise of the right and the intent to relinquish that right are essential elements." *Employers Ins. Co.* v. *Great American,* 214 Va. 410, 412-13, 200 S.E.2d 560, 562 (1973). Here, the lessor's knowledge of its right is not in question. The focus of the waiver inquiry is upon intent to relinquish. "[T]he burden rests on the party relying on a waiver . . . to prove the essentials of such waiver . . . by clear, precise and unequivocal evidence." *Utica Mutual* v. *National Indemnity,* 210 Va. 769, 773, 173 S.E.2d 855, 858 (1970); *accord Schulze* v. *Kwik-Chek Realty,* 212 Va. 111, 112, 181 S.E.2d 629, 630 (1971). We find no such evidence in this record.

It is true that the lessor accepted smaller monthly payments than those the lessee was obligated by the lease to make and, until 1976, did so without protest. But, standing alone, an obligee's acceptance of less than full performance by the obligor does not prove intent to relinquish the right to enforce full performance. In *May* v. *Martin,* 205 Va. 397, 137 S.E.2d 860 (1964), the trial court had instructed the jury that if " 'W. T. May, either by words or actions, acquiesced in the delay in the construction of the houses, then [he] may not hold [Martin] responsible for interest incurred during such acquiescence.' " *Id.* at 402, 137 S.E.2d at 863. We reversed a judgment for Martin on the ground, *inter alia,* that the instruction "has given to acquiescence the same weight, meaning, and implication as waiver. Acquiescence, that is, the failure to protest or object, is an element of waiver; but does not of itself constitute waiver." *Id.* at 404, 137 S.E.2d at 864. Citing numerous precedents for the rule that intent is the essence of waiver, we went on to say:

> There is no clear proof that May intentionally and voluntarily chose to waive his rights. In electing to allow Martin to complete the construction of the houses, notwithstanding the delay, May chose a course of action which he was permitted to take. He thereby waived nothing as to his right to claim damage for the failure of Martin to perform his contracts within a reasonable time under the circumstances. . . .

*Id.* at 404-05, 137 S.E.2d at 865.

The principles underlying our opinion in *May* control our decision in this case. We recognize that, although the cost of fuel oil required to produce the steam increased in the years following 1960, the lessor slept on its right to enforce the utilities clause of the lease. But the doctrine of laches does not apply in this action at law. *See Grenco* v. *Nathaniel Greene,* 218 Va. 228, 233, 237 S.E.2d 107, 111 (1977). And it appears that, as to the damages awarded by the trial court, the statute of limitations had not run against the right of action. While the lessor's failure to move sooner to enforce its contractual right shows passive acquiescence in the lessee's partial performance, such neglect does not prove intent to relinquish the right to full performance.

We hold, therefore, that Stanley's did not carry its burden of proving modification by waiver, and we will affirm the judgment.

*Affirmed.*