**JACKSON HEWITT, INC., Plaintiff,**

v.

**Alan GREENE, Defendant.**

**Alan GREENE, Plaintiff,**

v.

**JACKSON HEWITT, INC., Defendant.**

Nos. 2:94cv665, 2:94cv866.

United States District Court,
E.D. Virginia,
Norfolk Division.

Oct. 26, 1994.

Stephen Edward Noona, Kaufman & Canoles, Norfolk, VA, James W. Kennedy, Paul, Hastings, Janofsky & Walker, New York City, for plaintiff/defendant.

Alan Greene, pro se.

## MEMORANDUM ORDER

CLARKE, District Judge.

This matter comes before the Court on Cross–Motions for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reason set forth below, Summary Judgment is **GRANTED** on behalf of Jackson Hewitt, Incorporated against Alan Greene. Alan Greene's Summary Judgment Motion against Jackson Hewitt, Incorporated is **DENIED**.

### I.

This contractual dispute arose out of the franchise agreement (the "Agreement") entered into by Jackson Hewitt Incorporated ("JHI") and Alan Greene ("Greene") on November 22, 1991. JHI is a national franchisor of "income tax preparation retail franchise stores." Greene is a JHI franchisee whose territory is located in Westchester County, New York.

JHI franchisees are provided with, among other things, income tax related computer software programs. One of the JHI programs (the "Preparation Software") allows a franchisee to prepare a customer's income tax return based on a series of questions asked by the computer operator. After the operator inputs the customer data, the Preparation Software performs the computations required to complete the customer's tax return.

In conjunction with the Preparation Software, JHI has developed a service known as the "Superfast Refund" payment program. The Preparation Software and the Superfast Refund are meant to function as an integrated business system. Using the Superfast Refund program, the customer's tax return is electronically filed by JHI franchisees with the Internal Revenue Service (the "IRS"). If the customer is due a refund, JHI franchisees then obtain a bank loan on the customer's behalf through JHI and a participating bank, and pay the customer his anticipated refund amount. Of course, the bank fees and the franchise fees are deducted from the customer's refund amount. JHI, as franchisor, receives a certain percentage of the franchisee's revenue.

On April 28, 1994 JHI sent Greene a letter which purported to terminate Greene's franchise (the "Franchise"). Greene responded on May 24, 1994 by filing suit in the Supreme Court of the State of New York alleging that the termination notice was invalid. The New York court issued an *ex parte* temporary restraining order preventing JHI from interfering with Greene's operation of the Franchise.

On June 23, 1994 JHI filed suit in the Eastern District of Virginia complaining that Greene had breached the Agreement and violated federal trademark law. After removing Greene's New York state action to federal court, the New York District Court then transferred it to this Court based on the Agreement's exclusive choice of forum clause. The two cases were consolidated on August 23, 1994.

## II.

This matter is now before the Court on cross-motions for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Both Greene and JHI have briefed the issues and provided supporting affidavits. The Court also heard oral argument on October 11, 1994. Accordingly, the cross-motions are now ripe for disposition.

### A. *The Legal Standard For Summary Judgment:*

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed.R.Civ.P. 56(c). To avoid summary judgment, the opposing party must introduce evidence to create an issue of material fact on "an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A verified complaint based on personal knowledge serves as the equivalent of an opposing affidavit for the purposes of summary judgment. *Williams v. Griffin,* 952 F.2d 820, 823 (4th Cir.1991).

### B. *The Language Of the Agreement Controls:*

It is the duty of the Court to decide the meaning of an unambiguous written agreement as a matter of law. *Winn v. Aleda Constr. Co.,* 227 Va. 304, 307, 315 S.E.2d 193, 194 (1984). In all relevant respects, the Court finds the Agreement unambiguous as written. Paragraph 18(c) of the Agreement states that,

[n]o amendment, change or variance from this Agreement shall be binding upon either Franchisor or Franchisee except by mutual written agreement.

This clause purports to bar any oral modification of the Agreement. However, under Virginia law, written agreements can be modified by subsequent oral agreement if the express mutual assent of both parties is demonstrated. *Stanley's Cafeteria, Inc. v. Abramson,* 226 Va. 68, 72, 306 S.E.2d 870, 872 (1983). Mutual assent must be proven with "clear and unmistakable proof." *Id.* at 72–73, 306 S.E.2d at 873. Because neither JHI nor Greene offer any proof that the Agreement has been modified, the Court will interpret the Agreement as written.

### C. *Franchise Termination Under The Agreement:*

Section 13(a) of the Agreement provides fifteen (15) separate grounds which constitute "good cause" to terminate a franchise. In its actions against Greene, JHI relies specifically on the following termination provisions:

(xiii) If Franchisee is reasonably determined by Franchisor to have underreported by two percent (2%) or more its Gross Volume of Business to Franchisor on two or more occasions during the term of this Agreement, whether or not Franchisee subsequently rectifies such deficiency.

(xiv) If Franchisee violates any covenant of confidentiality or non-disclosure as contained in Paragraph 8 of this Agreement . . . without Franchisor's prior approval.

(Agreement, Paragraph 13(a) clause xiii, xiv). The Agreement further provides that termination is effective "either immediately upon

the date Franchisor gives written notice of termination or upon such other date as may be set forth in such notice of termination." Furthermore, while some of the termination provisions require that JHI provide a written Notice to Cure, neither clause xiii nor clause xiv state any such condition precedent.

## III.

### A. *Greene's Obligation To Report The Franchise's GVB:*

JHI terminated the Agreement in part because it believed Greene "consistently underreported" the Gross Volume of Business ("GVB") done under the Franchise. A franchisee's GVB is reported to JHI via a computer-generated periodic sales report known as a Gross Volume Report ("GVR"). The data for each GVR is taken directly from the computer database of the franchisee; this database is known as the "Books Database." During the tax season, which is defined as lasting from January 15 to April 30 (the "Tax Season"), a franchisee is required to electronically transmit via modem a GVR twice monthly. Thus each Tax Season has eight (8) reporting periods. JHI calculates its royalty fee based upon the GVR.

According to JHI, Greene underreported the Franchise's GVB in two ways: first, by claiming that Franchise customers were in fact preexisting clients of Greene; second, by improperly deducting from the Franchise's GVB certain compensation payments made by Greene to Franchise employees. The Court will examine each of these claims.

### 1. *The Preexisting Clients:*

■ The Agreement clearly excludes from the GVB all revenue derived from preexisting clients who are listed on Schedule D2 of the Agreement. (Agreement, Special Stipulation D1). JHI contends that during the 1994 Tax Season Greene invoked the preex-

isting customer exclusion for fifty-three (53) people who were not listed on Schedule D2.[1]

Greene admits that he misclassified Jackson Hewitt customers as preexisting clients, and that those misclassifications represent more than 2 percent (2%) of the Franchise's GVB for each of the eight (8) reporting periods during the 1994 Tax Season. But, Greene argues that he lacked the "intent to defraud" JHI and that the misclassifications were due to human error. Furthermore, Greene attributes much of that error to "flaws designed into the tax preparer's software" and to the fact that JHI has little economic incentive to correct these alleged flaws.[2] Greene concludes that, "because human error is inevitable in [the] attribution of clients as preexisting, or not," a Notice to Cure should have been provided.

However, the Court finds that the Agreement is clear on its face: if a franchisee underreports his GVB by two percent (2%) or more on two (2) separate occasions, then the franchisor may terminate the franchise "whether or not franchisee subsequently rectifies such deficiency." (Agreement, Paragraph 13(a) clause xiii). Fraudulent intent is not required of the franchisee. And, despite Greene's protestations to the contrary, a Notice to Cure is not required under the Agreement for franchise termination pursuant to clause xiii.

Furthermore, the Court stresses that the misclassifications were caused solely by Greene and his employees; not the JHI system or its software. As Greene himself admits, a franchisee need only compare the customer's social security number with the list of social security numbers on Schedule D2 in order to determine preexisting customer status. While this work may be tedious, and perhaps time consuming during the "frenetic" Tax Season, under the Agreement it is undeniably Greene's obligation to separate the preexisting customers from the JHI

---

1. In the 1994 tax season Greene processed a total of 1150 tax returns.

2. Greene purports to demonstrate that the software is unwieldy by pointing to documents JHI has filed in this case. According to Greene, there were only forty-eight (48), not fifty-three (53), misclassified customers. However, Greene

does not dispute that in any event the misclassified customers represent more than two percent (2%) of the Franchise's GVB. Accordingly, for purposes of their Summary Judgment Motion, JHI has agreed to adopt Greene's conclusions with respect to the number of misclassified customers.

customers and prepare GVB reports accordingly.[3] Greene will not be heard to transfer his contractual obligations to JHI.[4]

Therefore, because Greene admits that he underreported the Franchise's GVB by at least two percent (2%) on two (2) or more separate occasions, the Court is compelled by the Agreement's plain language to find that Greene is in violation of Paragraph 13(a) clause xiii of the Agreement and is thus subject to termination under the Agreement.

### 2. *The "Pieceworker" Discounts:*

In order to cultivate new markets for the Franchise, Greene began to use what he refers to as "pieceworkers."[5] In all, Greene used five such individuals: Blanca Morgado, Edward Broccolo, Nelson Morales, Mohan Matabeek and Saul Merino. Because much of the evidence centered around Blanca Morgado ("Morgado"), the Court will focus its discussion accordingly.

Before her affiliation with Greene, Morgado had cultivated a client base for her tax preparation services in the local Latino community. In March of 1993, Morgado and Greene, who hoped to grab a foothold in the Latino market segment, decided to join forces. Under their agreement, Morgado would solicit customers at her place of business,[6] prepare their tax returns by hand, and, if the customer qualified for a Superfast Refund, collect the required forms and signatures. Then, using the forms hand prepared by Morgado, Greene would input this information into the Books Database and obtain rapid tax return loans for these customers using the JHI Superfast Refund technology. Between March and April of 1993, Greene processed about twenty (20) tax returns in this manner.

In 1994, Greene and Morgado decided to work together once again. However, because Morgado had prepared all the 1993 tax returns by hand, a number of them contained computation mistakes. Therefore, in 1994, Greene provided Morgado with a copy of the Preparation Software in order to "save [Greene] time and effort."[7] Using that software, Morgado was able to process returns more quickly and with less error. Moreover Greene was not required to manually input the customer information into the JHI database. Instead, Morgado was now able to save the information on a computer disk and simply give the disks to Greene for processing.

As a consequence of using the Superfast technology, Greene was forced to input data into the Franchise database. Once a customer's data is entered, the computer creates an individual database file which can then be electronically transferred to the IRS. Another feature of the JHI software is the electronic discount function. When the taxpayer data is complete, the computer (before calculating the applicable fee) "asks" the preparer whether there are any "discounts and adjustments" to the fee. The preparer is required to respond, and then the computer prints a customer receipt.

If a discount amount is entered, the computer subtracts that amount from the standard Franchise processing fee and, when a refund check is issued to the customer, the check reflects the amount of the discount. That is, the customer's refund check is increased by the amount of the discount provided. The bank also deposits whatever fee

---

3. Contrary to Greene's assertions, the Court does not think this so Herculean a task as to make misclassification "inevitable." Schedule D2 consists of twenty (20) pages with approximately twenty (20) names per page. The client names are listed in alphabetical order.

4. Thus Greene's argument that the misclassifications amount only to improper allocation and not non-disclosure of GVB is specious. The fact that JHI could have discerned the proper allocation by scrutinizing the totality of information Greene provided JHI is immaterial. Greene had a contractual obligation to classify his customers correctly and produce a reasonably accurate GVR.

5. Greene also uses the phrase "independent contractor" to describe these workers.

6. A travel agency located in New Rochelle, New York.

7. Edward Broccolo also received a copy of the Preparation Software. However, although Broccolo sent Greene a number of returns, the Preparation Software had not been used to prepare them. The other pieceworkers did not use the Preparation Software.

is withheld—the discounted fee or the regular fee—into the Franchise account.

In the course of his dealings with the various pieceworkers, Greene would enter the taxpayer information and indicate to the computer that no discount was given. Thus, if the loan was approved, the bank would credit the Franchise with its regular non-discounted fee. However, after the bank loan was issued, and after the Franchise has received its fee from the bank, Greene would then re-enter the customer's computer file and indicate that a discount was given. This after the fact discount amounted to the salary which Greene paid the pieceworkers for their services.

The discount was also reflected in the computer generated GVR. Under the Agreement, the Franchise was to pay JHI eighteen percent (18%) of the GVB. Thus, when JHI computed its royalty percentage, the amount the Franchise owed was derived not from the total sum collected but rather from the total sum collected minus the pieceworker payments.

During the 1994 Tax Season, Morgado and Greene processed approximately seventy (70) returns using the discounting procedure. Morgado was paid "by the piece" at $42 per return. The rest of the pieceworkers were paid a variable amount, usually between $40 and $60 per tax return. For the 1994 Tax Season, the Franchise's GVB was $65,520, a sum which does not include the $6,078 that Greene deducted as discounts.

JHI contends that the discounting practice was in violation of the Agreement and that the true Franchise GVB should be $71,698. Again, Greene defends the discounting practice as supported by the Agreement and does not dispute the amounts that JHI cites as being improperly discounted. He thus concedes the fact that, if the discounting practice is found improper, Greene will have underreported his GVB by more than two percent (2%) on two (2) or more occasions.

■ The Court agrees with JHI, and finds little merit in Greene's arguments to the contrary. The definition of GVB found in Schedule D1 of the Agreement provides as follows:

The term Gross Volume of Business ... shall mean the aggregate gross amount of all revenues from whatever source derived ... excluding only discounts allowed by Franchisee, revenues derived from any Preexisting Client listed on Schedule D2, [and sales taxes] * * * which arise from or. are derived by Franchisee or by any other person from business conducted or which originated in, on, from, or through the Franchised Business, and whether such business is conducted in compliance with or in violation of the terms of this Agreement.

(Agreement, Schedule D1). Greene contends that the phrase "discounts allowed by franchisee" is unclear in so much as what constitutes a proper "discount" is not defined. He then points to the Jackson Hewitt Operating Manual (the "Operating Manual") which indicates that the discount function is to be used for "negative adjustments for ... coupons, bounced checks or refunds."[8] Thus, Greene concludes his use of the discount function was allowable because,

[the discount function] is used for various purposes in addition to discounts which taxpayers receive (e.g., bounced checks). Clearly a bounced check is not a discount.

Greene argues that because the practice was not specifically disallowed by the Agreement or the Manual (collectively the "JHI Materials"), it is therefore authorized. In other words, Greene contends that the discount function operates as a "catchall" provision for franchisees to balance their books. The Court disagrees with this overbroad conclusion.

Contrary to Greene's assertions, the specified uses of the discount function contained in the Manual have one common denominator: they all inure to the benefit of the consumer. That is, they are *negative adjust-*

---

8. The Agreement specifically references the Jackson Hewitt Confidential Operating Manual (the "Manual"), which provides that Greene is bound to operate his franchise pursuant to the standards proscribed therein. (Agreement, Paragraph 7(b)). Thus, the Court will read the Manual as part of the Agreement. *Marriott v. Harris*, 235 Va. 199, 215, 368 S.E.2d 225, 232 (1988).

*ments* in the sense that neither JHI nor its franchisees derive direct positive cash flow from their use. On the contrary, both JHI and its franchisees suffer a loss in the short run when the discount function is employed properly. Greene's use of the discount function, on the other hand, provides him with positive cash flow and denies JHI its commensurate royalty fee.[9]

The Court also notes that nothing in the JHI Materials either authorizes or contemplates that a franchisee would make bogus computer entries. Yet, that is exactly what Greene did. When Greene initially indicated that "no discount" was given, he admits that he planned to later re-enter the file and adjust the figures. Consequently, Greene knowingly and intentionally manipulated the software and, in another move unauthorized by the JHI Materials, provided his customers with inaccurate receipts. Moreover, Greene never submitted any verification for the contractor discounts, as is specifically required by § 47–4 of the Operating Manual. The machinations required to effectuate this practice should have indicated to Greene that his actions contravened the intended use of the software.

Lastly, the fact that Greene used the money to pay his pieceworkers does not alter the analysis. Greene admits that under the Agreement JHI franchisees cannot deduct franchise employees' salaries from the GVB using the discount function. The Court agrees with JHI when it argues that Greene cannot "transform" wages into "discounts" through the expedient of calling employees "independent contractors." In fact, the Court finds no distinction between regular salaried employees and Greene's so-called "independent contractors" which is relevant to the reporting of the GVB: just as Greene could not deduct regular salaries from the GVB, so too was he barred from deducting fees paid to "independent contractors."

Next, Greene attempts to limit his exposure for the discounting practice by arguing that, even if he owed royalties on the discounted sums, he "indisputably" disclosed the pieceworker discounts to JHI. Greene bases this argument on the so-called "receipt dump" column that is found on one of the financial disclosure sheets which franchisees submit to JHI. Greene asserts that even though the contractor discounts were not reported as GVB, they were indirectly reported in the receipt dump column.[10] JHI counters that it was entitled to "rely on the integrity of the GVB report" and that it should not be prejudiced because it did not uncover the practice at an earlier date.

The Court agrees with JHI. The Agreement provides that Greene shall pay JHI a "fee equal to twelve percent (12%) of the Gross Volume of Business" as a "recurring franchise fee" and "six percent (6%) of the Gross Volume of Business" as an advertising fee. (Agreement, Paragraph 5(b) clause i-ii). As discussed above, it is clear that by using the discounting practice Greene under-reported the Franchise's GVB. Thus, it is beside the point that Greene disclosed the discounts in the raw data he submitted to JHI because, pursuant to the Agreement, not only was JHI calculating its royalties based on the GVRs, but Greene was also paying royalties based on the GVRs.[11]

---

**9.** Furthermore, the discounting practice provides the pieceworkers with a specific benefit: they need not collect their fee directly from the customer. Greene does not explain why the pieceworkers should benefit from the JHI system yet not pay a royalty for its use.

**10.** This is the same argument Greene made with respect to the preexisting customer issue. And again, the court finds it without merit. While it is true that JHI could have discovered the discount scheme if it had scrutinized more carefully the financial information which Greene provided, that fact in no way diminishes Greene's contractual obligation to report his GVB accurately.

**11.** Greene also argues that JHI should be "barred by estoppel and waiver, duress and adhesion" from exercising its contractual right to terminate him because the discounting practice had the "apparent approval" of Don Austin, a JHI field coordinator. However, the Court refuses to consider this argument because, after being given appropriate notice by this Court, Greene has not filed an affidavit which supports his contention. Furthermore, JHI's Exhibit 70 (an unsigned communication from Don Austin to Greene dated March 8, 1993) indicates that Austin did not approve of the discounting practice. Lastly, even assuming *arguendo* that Austin did agree to the practice, Greene is nevertheless bound by the written terms of the agreement because, as discussed above, Greene has not pro-

■ Because no reasonable interpretation of the Agreement could support Greene's discounting practice, we find that the use of the discount function to offset the GVB by the amounts paid to pieceworkers was unauthorized by the Agreement. Consequently, we find that Greene violated Paragraph 13(a) clause xiii of the Agreement by underreporting the Franchise's GVB by at least two percent (2%) on two (2) or more separate occasions. Thus the Franchise is subject to Termination under the Agreement.

### B. *Greene's Disclosure Of Software to Morgado And Broccolo:*

■ JHI also contends that Morgado's "unauthorized" use of the Preparation Software constituted a violation of Paragraph 8(b) of the Agreement. Paragraph 8(b) provides that a franchisee "shall at all times use its best efforts to keep ... computer software ... within the Jackson Hewitt Tax System ... and shall limit access to employees and independent contractors of franchisee on a need to know basis." (Agreement, Paragraph 8(b)).

Greene admits that he gave Morgado and Broccolo copies of the Preparation software. However, he contends that these disclosures were authorized because they were independent contractors who needed the software to perform their function. Greene points out the fact that he gave Morgado and Broccolo only a portion of the JHI software: the Preparation Software.[12] He then explains that, without the rest of the software, the

Preparation Software is "virtually useless" because a tax return cannot be printed from the computer screen.[13] Further, Greene says that there are numerous products on the market which perform the same function as the Preparation Software.

However, the crucial point which Greene fails to address is that the Agreement obliges him to keep the software "within the Jackson Hewitt Tax System." This raises a problem for Greene because Morgado was directly competing with the Franchise.[14] Or, more precisely stated, every tax return which Morgado prepared pursuant to her agreement with Greene constituted a discrete amount of Franchise revenue which JHI was isolated from collecting royalties upon. It is true, as Greene points out, that after Morgado prepared the returns, the Franchise (and therefore JHI derivatively) realized some pecuniary gain for electronically transmitting them and obtaining a Superfast Refund. However, JHI lost the opportunity to have each Morgado customer walk in off the street and become a full-fledged Franchise customer. Instead, Greene allowed Morgado to prepare her customer's tax returns *using the JHI Preparation Software,*[15] and then Greene deprived JHI of subjecting that transaction to a *full royalty payment* by using the discounting practice.[16] In sum, Greene used the JHI Preparation Software to generate business for the Franchise, but then denied JHI its legitimate contractual right to collect royalties on the full transaction amount.

vided "clear and unmistakable proof" of mutual assent to the alleged modification. *Stanley's Cafeteria*, 226 Va. at 72, 306 S.E.2d at 872.

12. Greene did not provide Morgado or Broccolo with the software required to file a return electronically or obtain a Superfast Refund.

13. However, Greene concedes that a customer's data could be entered into the computer, the Preparation Software could prepare the return, and the correct numbers could then be copied from the computer screen onto a blank tax return form.

14. The record is unclear as to the extent of Broccolo's use of the software. However, even assuming that Greene did not violate the Agreement's non-disclosure provisions with Broccolo,

the Court's conclusion as to Morgado remains unchanged.

15. Not only did Morgado use the Preparation Software, but she also used forms which read "Firm Name—Jackson Hewitt Tax Service, 199 North Avenue, New Rochelle, New York."

16. Had Morgado not used the Preparation Software or the JHI forms and logo, then JHI could not complain because it would not have lost anything. But, JHI does have the right to insist that its software not be used to deprive JHI of even the possibility of recognizing a royalty payment. Greene's argument that Morgado's Spanish speaking customers "were not otherwise available" to the Franchise is not particularly convincing because it cannot be said with any degree of certainty.

Clearly, this use of the Preparation Software cannot be reconciled with Greene's obligation to keep the software within the Jackson Hewitt system. Therefore, the Court finds that Greene violated Paragraph 8(b) of the Agreement by providing Morgado with a copy of the Preparation Software. Thus the Franchise is subject to termination under Paragraph 13(a) clause xiv of the Agreement.

### C.  *Greene's Post Term Obligations:*

■ Among other things, JHI has requested that this Court enforce Paragraph 11(b), the Agreement's no competition provision. Under Virginia law, such agreements are enforceable where: 1) from the standpoint of the franchisor, the restraint is no greater than necessary to protect the franchisor's legitimate interest; 2) from the standpoint of the franchisee, the restraint is not unduly harsh or oppressive in curtailing the franchisee's right to earn a livelihood; and 3) the restraint does not offend sound public policy. *New River Media Group, Inc. v. Knighton,* 245 Va. 367, 368, 429 S.E.2d 25, 26 (1993); *Blue Ridge Anesthesia & Critical Care, Inc. v. Gidick,* 239 Va. 369, 370, 389 S.E.2d 467, 468 (1990).

■ Given the facts of this case, the Court believes that the three *New River* criteria have been met. The provision is reasonable in that its scope is limited by both time (one year) and geography (within ten miles of Greene's previous territory). These conditions, *to which Greene expressly agreed,* are not unduly harsh or oppressive to Greene's ability to earn a living. Furthermore, nothing in the record suggests that enforcement would be unwise from a public policy perspective. Accordingly, the Court finds the no competition provision to be valid and enforceable.

JHI also requests that the Court depart from the traditional American Rule and award attorney's fees against Greene pursuant to Paragraph 19(c) of the Agreement. However, Greene has not responded to this motion and, as always, the Court is hesitant to depart from the well-established rule. Therefore, the Court will consider this matter separately. JHI is directed to set forth in detail its fee amount within ten (10) days of this Order. Greene shall then have ten (10) days in which to respond, and JHI shall have five (5) days in which to reply. Furthermore, the parties should alert the clerk of this Court as soon as possible if oral argument is necessary.

### D.  *Conclusion:*

The Court finds that Greene caused three (3) independent violations of the Agreement. During the 1994 Tax Season Greene violated Special Stipulation D1 and D2 of the Agreement when he repeatedly misclassified Jackson Hewitt customers as preexisting clients. Greene also violated the Agreement when he repeatedly discounted payments made to his pieceworkers from the Franchise's GVB. Lastly, Greene violated Paragraph 8(b) of the Agreement by providing Blanca Morgado with the protected JHI Preparation Software and then processing "Superfast Refunds" for customers whose tax returns had been prepared with that protected software.

Furthermore, the Court finds that, pursuant to Paragraph 13(a) clause xiii and clause xiv of the Agreement, each of the three (3) listed violations constitutes an adequate and independent ground to terminate the Agreement without a Notice to Cure. Accordingly, this Court **TERMINATES** the Franchise Agreement for good cause shown and **ORDERS** that, pursuant to § 14(a) of the Agreement, Alan Greene shall: 1) cease to be a franchisee of JHI; 2) return to JHI the Confidential Operating Manual and all JHI software; 3) cease the use of the Jackson Hewitt Tax System and all its Licensed Marks; 4) provide JHI a list of all JHI clients; and shall 5) transfer or assign all his telephone and advertisement references to JHI. The Court further **ORDERS** that, for a period of one (1) year from April 28, 1994, Alan Greene shall comply with the terms of the covenant to not compete set forth in § 11(b)(i-ii) of the Agreement. The Court shall determine the question of attorney's fees separately.

### IV.

### A.  *Greene's Motion For Summary Judgment:*

■ As indicated, Greene has also moved this Court for Summary Judgment.

Greene's first two causes of action are breach of contract claims. Consistent with the Court's opinion above, those claims are dismissed. Greene's six remaining claims, which the Court reads as alleging fraud,[17] are also dismissed because Greene has failed to meet his evidentiary burden.

■ Greene's fraud claims center around the allegation that, from the inception of the Agreement, JHI never intended to award Greene additional expansion franchises. To prevail under a fraud theory, Virginia law requires a plaintiff to prove by clear and convincing evidence that the promise at issue was false at the time it was made. *Lissmann v. Hartford Fire Ins. Co.*, 848 F.2d 50, 53–54 (4th Cir.1988); *Colonial Ford Truck Sales, Inc. v. Schneider*, 228 Va. 671, 676, 325 S.E.2d 91, 94 (1985).

Greene has submitted no such evidence. First, Greene points to the Declaration of Donald J. Austin ("Austin"). Austin was a Jackson–Hewitt Field Coordinator from November of 1992 until July of 1993. In his Declaration, Austin echoes Greene's assertions that Greene desired to expand and that, in Austin's opinion, Greene was entitled to expand. However, Austin provides no testimony which would support Greene's fraud theory; that is, that JHI never intended to let Greene expand. Furthermore, as JHI points out, Austin couldn't possibly have any such information because he did not become affiliated with JHI until more than a year after the Agreement was signed.

■ Second, Greene puts forward as evidence the interview notes taken by Maggie Malloy ("Malloy") during Greene's initial interview with JHI. In those notes Malloy observes that,

Alan was a difficult interview. He has that NY style that's hard to penetrate. He wants to compete with the other company so will probably follow our lead. He will need some firm supervision!

Malloy also indicates that Greene's willingness to follow standard operating procedure is questionable, but does go on to approve Greene's application with a "weak yes."[18] Greene contends that Malloy's comments evince a "distinctly negative" attitude towards him from the outset. However, the Court finds this comment insufficient to meet the clear and convincing standard set forth in *Colonial Ford*. Foremost is the observation that, despite Malloy's hesitations, JHI did grant Greene a franchise. The Court cannot conceive of a reason—and Greene proffers none—why JHI would grant a franchise and at that same time not want it to expand.

■ However, it is not fraud for JHI to later decide that expansion is unwarranted. In fact, Greene himself admits JHI informed him that "substantial and reasonable conformity with the terms of the Franchise Agreement" was necessary before expansion territory would be granted. Given the substance of this litigation, it is not surprising that Greene's expansion requests were denied.[19] This evidence weighs heavily against a finding of fraud.

Therefore, this Court finds that based on the evidence presented no rational juror could conclude that JHI intentionally and knowingly misled Greene by falsely representing to Greene his chances of franchise expansion. Accordingly, the Court grants JHI Summary Judgment against the eight causes of action stated in Greene's complaint.

---

17. Greene, who has a law degree, drafted his memorandum in a narrative style which failed to press several of the allegations contained in his complaint and did not clearly address others. Thus, in an effort to be solicitous of Greene as a *pro se* litigant, the Court was required to interpret Greene's submissions. To the extent that Greene's allegations are meant to sound in contract rather than tort, the *Court* observes that under Virginia's Parole Evidence Rule prior or contemporaneous negotiations cannot be introduced to contradict a written agreement that is complete, unambiguous and unconditional.

*Swengler v. ITT Corp.*, 993 F.2d 1063, 1069 (4th Cir.1993).

18. Greene's application was initially rejected but then later approved after Greene made a personal visit to the JHI offices.

19. JHI also submitted affidavits which make clear that its denials of Greene were supported by specific instances of non-compliance with the Agreement.

## V.

In conclusion, this Court finds that for the foregoing reasons JHI's Motion for Summary Judgment is **GRANTED** and Alan Greene's Motion for Summary Judgment is **DENIED**.

**IT IS SO ORDERED.**