**ALLEGHENY ENERGY, INC.**

v.

**VIRGINIA ELECTRIC AND POWER COMPANY.**

**No. Civ. Y–98–1786.**

United States District Court,
D. Maryland.

Oct. 13, 1999.

---

William J. Murphy, Baltimore, Maryland, John J. Connolly, Baltimore, Maryland, for plaintiff.

John Jay Range, Washington, D.C., Virginia W. Powell, Richmond, Virginia, for defendant.

## MEMORANDUM OPINION

JOSEPH H. YOUNG, Senior District Judge.

### I.   Factual Background

Allegheny Energy, Inc. ["Allegheny"] and Virginia Electric and Power Company ["Virginia Power"] are electric utilities operating in several states in the Mid–Atlan-

tic. In June 1981, the two companies entered into a Project Construction and Purchase Agreement ["Project Agreement"] whereby Allegheny became an equity investor in the Bath County Pumped Storage Generating Station ["Bath County Project"]. Allegheny agreed to purchase a 20% interest in the Bath County Project with an option to increase its interest in the future. In addition to construction and capital costs, Allegheny promised to pay funds to compensate Virginia Power for federal and state income taxes resulting from the sale. At the closing in 1982, Allegheny paid $16 million to cover these taxes. Because these payments factored into the formula at a 50% ownership ratio, Allegheny's actual ownership interest on the closing date was 21.21%.

Allegheny later decided to increase its ownership interest to 40%. The two companies executed the "Increased Participation Transaction" ["IPT"] in 1985, which required Virginia Power to convey to Allegheny a 16.95% interest in the Bath County Project. The parties intended this conveyance to bring Allegheny's ownership interest to roughly 40%.

To provide for the uncertain tax consequences of the IPT, the parties entered into a written agreement—the "Tax Indemnification Agreement" ["TIA"]—on June 1, 1985. Paragraph 12 of the TIA provides that:

> In the event that Virginia Power shall receive a refund of any income taxes paid by reason of a reversal of an earlier determination of a tax liability asserted with respect to [the IPT] and [Allegheny] previously ha[s] paid to Virginia Power the amount of the earlier tax payment under the terms of this agreement, Virginia Power shall, within 30 days after its receipt of such refund, pay over to [Allegheny] ... the amount of such refund, inclusive of any interest or refund of additions to tax, fines, and penalties that may have been included in such refund, together with interest....

TIA ¶ 12. Under Paragraph 9, Allegheny promised to pay the "Tax Effect on VEPCO," as defined in the Project Agreement, plus interest within 30 days of receiving notice from Virginia Power that it had paid taxes related to the IPT. *Id.* ¶ 9. Paragraph 4 required Virginia Power to notify Allegheny in the event that tax authorities "examine into or dispute the treatment" of any "Increase" in ownership, such as the IPT. *Id.* ¶ 4. Finally, Paragraph 5 obligated Virginia Power to include Allegheny in negotiations with taxing authorities over ownership increases. *Id.* ¶ 5.

Virginia Power's 1985 federal tax return reported a capital gain of $107,564,127 attributable to the IPT. This capital gain resulted in a tax burden of approximately $30.1 million. Allegheny agreed to Virginia Power's initial determination to treat the IPT as taxable, with the understanding that Allegheny would later ask Virginia Power to file a refund claim. Accordingly, Allegheny paid Virginia Power $30,138,914 plus interest as its Tax Effect payment.

In 1987, the parties adjusted this amount in a "true-up." They agreed that Virginia Power's actual gain from the 1985 sale was only $101,144,688 and expected that this lower gain figure would result in a lower tax burden for Virginia Power. Allegheny had promised to pay the Tax Effect on Virginia Power under Paragraph 9 of the TIA, but because Allegheny had already paid over $30 million to Virginia Power, Virginia Power returned over $1 million to Allegheny. The net effect was that Allegheny paid Virginia Power $28,-526,027.

In 1989, IRS completed an examination of Virginia Power's tax returns regarding the initial 1982 sale. Virginia Power had protested IRS's treatment of that sale because it had reflected only a 20% ownership transfer when it should have reflected a transfer of 21.21%. IRS eventually accepted the 21.21% figure and settled on a compromise that reduced the reported gain attributable to the 1982 sale from

approximately $48 million to $38 million. This $10 million reduction resulted in a tax benefit to Virginia Power of roughly $2.7 million. Under the terms of the 1981 Agreement, Allegheny received no benefit from the adjustment.

IRS and Virginia Power agreed to a second tax adjustment in February 1991. This "interim audit adjustment" was intended to modify Virginia Power's 1985 tax return to reflect the previous adjustments to the 1982 return. Because the 1982 sale had been adjusted to 21.21% and Allegheny owned 40% of the project after the 1985 sale, IRS concluded that Allegheny had purchased only a 18.79% ownership interest in the 1985 sale. As a result, Virginia Power's capital gain for the 1985 sale increased to $104,672,798, and the corresponding tax burden increased to $29,521,066. This new tax burden, however, was $995,039 more than Allegheny had paid after the 1987 adjustment. The federal tax portion of this sum—$924,219—is the principal amount in dispute at this time.

The current controversy arose in 1997 when Virginia Power received a refund from IRS. The parties had reached a settlement with IRS that reduced Virginia Power's tax liability associated with the 1985 sale to $19,690,853. Consequently, IRS issued a refund to Virginia Power on September 25, 1997. The total amount of the refund was $25,672,393, representing $9,759,393 in principal and $15,913,000 in accumulated interest. Virginia Power forwarded $22,759,812 of the refund to Allegheny by wire transfer, but retained $2,912,581. The amount retained by Virginia Power had three components: $924,219 in tax; $1,446,611 in interest on that amount; and $531,751 in "deficiency interest."

Virginia Power contends that it was entitled under the TIA to retain part of the refund. Because Allegheny had previously paid Virginia Power $28,526,027 to cover the tax effects of the IPT, Virginia Power simply reimbursed Allegheny for the difference between that amount and the IRS settlement, plus interest.[1] Allegheny takes a somewhat different view of this event, claiming that Virginia Power withheld $2,912,581 of the refund, all of which should have been paid to Allegheny. The parties agree that the $924,219 plus associated interest is at the crux of the controversy.

Allegheny bases its claim against Virginia Power on several breach of contract theories. First, Allegheny claims that Virginia Power breached Paragraph 12 of the TIA by failing to pay Allegheny the full amount of the 1997 refund, claiming it was never obligated to pay the $924,219 in question because it had already paid "the amount of the earlier tax payment under the terms of this agreement" as required by Paragraph 12. Allegheny reasons that by 1987, it had paid taxes on the 40% sale, regardless of subsequent adjustments. Second, Allegheny argues that it should be relieved from paying the disputed sum because Virginia Power never notified it of the interim audit adjustment negotiations with IRS in 1991. This lapse, claims Allegheny, breached Paragraphs 4 and 5 of the TIA. Finally, Allegheny contends that Virginia Power waived its claim to the $924,219 because it knowingly relinquished its right to recover these funds.

Virginia Power responds by denying that a breach occurred in the first place. It adds that even if a breach did occur, Allegheny failed to prove that the breach caused Allegheny to incur damages. Virginia Power also argues that the doctrine of waiver does not apply because it did not intentionally give up a known right. Finally, Virginia Power asserts a counterclaim for $2,388.50 to cover costs incurred by its outside tax counsel in 1997.

1. $28,526,027 − $19,690,853 = $8,835,174. This total plus $924,219 equals the principal component of the IRS refund.

## II. Legal Discussion

### A. Breach of Contract

■ Allegheny's central claims allege breach of contract. Under Virginia law, a plaintiff seeking to establish a breach of contract must show that: (1) the defendant owed plaintiff a duty; (2) the defendant breached that duty; and (3) the breach caused injury or damage to the plaintiff. *Westminster Investing Corp. v. Lamps Unlimited, Inc.*, 237 Va. 543, 379 S.E.2d 316, 317 (1989). In the present controversy, Allegheny has claimed damages of $2,912,581 resulting from breaches of Paragraphs 4 and 5 and Paragraph 12 of the TIA. Allegheny bases its Paragraph 4 and 5 breach claim on Virginia Power's failure to notify it of its 1991 negotiations with IRS over the interim audit adjustment. The breach of Paragraph 12, according to Allegheny, is the result of Virginia Power's failure to pay over the entire 1997 IRS refund to Allegheny. The Court finds that Allegheny has failed in both instances to establish a breach of contract.

■ Starting with the third *Westminster* breach element, the Court finds that Allegheny has not proved actual damages as a result of the alleged breach of Paragraph 12. Assuming arguendo that Virginia Power breached Paragraph 12 by withholding part of the 1997 IRS refund, that breach could not have caused damage to Allegheny because Allegheny had an independent duty under Paragraph 9 to pay the "Tax Effect on VEPCO." The parties defined the "Tax Effect on VEPCO" to mean "any Federal and State income tax liability of VEPCO resulting from any disposition from time to time by VEPCO to [Allegheny] of an undivided interest in the Project." Project Agreement § 1.1. Paragraph 9 of the TIA requires Allegheny to pay this "Tax Effect" within 30 days of notice of tax payment from Virginia Power. TIA ¶ 9. Aside from this 30–day win-

dow, however, the contracts contain no other relevant time limitations. The clear intent of the contracts, therefore, was to make Allegheny liable for the entire "Tax Effect" on Virginia Power that resulted from the 1985 IPT—regardless of the timing—and the only necessary condition was notice by Virginia Power. Given that Paragraph 9 is an independent condition with no time limitations, Virginia Power could, at any time, call upon Allegheny to honor its contract obligation to pay the full "Tax Effect." [2]

It follows that Virginia Power's withholding of part of the refund was merely a shortcut to carrying out the parties' duties under the contract. Virginia Power had a duty to pay over refunds pursuant to Paragraph 12. Allegheny had an independent duty to pay the 1985 IPT taxes. Thus, even if Virginia Power had paid over the full refund, Allegheny still owed Virginia Power the difference on the 1985 taxes, and Virginia Power could have recouped the funds under Paragraph 9. The Court concludes that Virginia Power did in one step what it could have done in two. Therefore, Allegheny suffered no damages, even if a breach did occur.

Allegheny attempts to avoid this outcome by pointing to the definition of the "Tax Effect on VEPCO" in the Project Agreement. The Agreement defines the term as "any Federal and State income tax liability of VEPCO resulting from any disposition from time to time by VEPCO to [Allegheny] of an undivided interest in the Project, *without taking into account the tax effect of any other transaction.*" Project Agreement § 1.1 (emphasis added). Allegheny claims that this language limits its liability because the $924,219 at issue resulted from another transaction. More specifically, Allegheny asserts that because Virginia Power's adjusted 1985 tax return was based on a reapportionment of the capital gain between the 1982 sale and the

---

**2.** Virginia Power has paid $29,521,066 in 1985 taxes on the IPT, but Allegheny has reimbursed it only for $28,526,027. Alleghe-

ny therefore remains under a duty to pay Virginia Power the remainder of that tax.

1985 sale, that return takes into account the tax effect of the 1982 sale.

The Court is not convinced by this argument. Allegheny misconstrues the tax transactions here as "shifting" capital gain from Virginia Power's 1982 return to its 1985 return. In truth, though, what occurred was a modification of Virginia Power's 1982 tax basis, and that tax basis is a factor of the percentage of ownership interest transferred. Thus, the driving force behind the present controversy over the "Tax Effect to VEPCO" is IRS's modification of the ownership interest that Virginia Power transferred to Allegheny in 1982. Because the true amount was 21.21%, and not 20%, IRS decided that the ownership interest sold in 1985 could only have been 18.79%. This correction—regardless of any tax effects—is what led to the adjustment of Virginia Power's 1985 tax return. In other words, Virginia Power's 1985 tax burden was driven not by the tax effect of the 1982 sale, but by the amount of ownership transferred in 1982. It follows logically that the 1985 "Tax Effect on VEPCO" at issue here did not "take into account" the tax effect of the 1982 sale. Instead, it took into account the ownership interests transferred in that sale. The Court concludes, therefore, that the "Tax Effect on VEPCO" in relation to the 1985 IPT is the full amount of taxes associated with the transfer of the 18.79% ownership interest. Allegheny is obligated to pay this full amount under Paragraph 9 of the TIA.

■ Allegheny's second breach claim must also fail because Allegheny did not prove that the alleged breach of Paragraphs 4 and 5 caused the damages it claims. Virginia courts have recognized that contract damages must be foreseeable and flow directly and naturally from the breach. *See E.I. du Pont de Nemours & Co. v. Universal Moulded Products Corp.*, 191 Va. 525, 62 S.E.2d 233, 254–55 (1950).

Here, Allegheny has claimed that Virginia Power breached Paragraphs 4 and 5 of the TIA in 1991 when it failed to notify Allegheny before undertaking interim audit adjustment negotiations with IRS. Even assuming that this failure was a breach, the evidence did not show that the claimed damages flowed directly and naturally from that breach. Indeed, Allegheny admitted in its interrogatory answers that the alleged breach "standing alone" did not "directly" cause the damages it seeks. Instead, the breach "may have facilitated" Virginia Power's "later, separate breaches."[3] This admission alone indicates an attenuated theory of causation. More importantly, however, the evidence shows that the 1991 interim audit adjustment was merely that—an interim adjustment. In contrast, the de novo IRS calculations leading to the 1997 refund actually caused the damages Allegheny claims in this case (i.e., its alleged share of the refund). Given that Allegheny has failed to establish a causal link between the 1991 breach and the 1997 damages, the Court must deny Allegheny's breach claim.

■ Finally, the Court finds that Allegheny has no claim to the portion of the 1997 IRS refund that the parties call the "deficiency interest." Apparently, there is no dispute that the deficiency interest is unrelated to the IPT, yet Allegheny advances the argument that the language of the TIA entitles it to this interest. In support of its position, Allegheny points to Paragraph 12, which requires Virginia Power to pay over to Allegheny "the amount of any such refund, inclusive of any interest." TIA ¶ 12. This argument, however, is plainly contrary to the intent of the contract. Paragraph 12 does require Virginia Power to pay over to Allegheny any refund it receives from an IRS reversal, plus interest, but the first sentence of that Paragraph clearly refers to funds that Allegheny previously paid to

---

**3.** In its Response to Defendant's Post–Trial Memorandum, Allegheny specified that the absence of notice in 1991 "facilitate[d] Virgi-

nia Power's later breach when it withheld the tax differential from the IRS refund."

Virginia Power to cover IPT-related taxes. *See id.* It is improbable to suppose that the parties intended that Virginia Power would give all IRS refund money to Allegheny simply because the IRS combined it in the same check with IPT-related refunds. Allegheny's claim to the deficiency interest is, therefore, denied.

## B. *Waiver*

■ Allegheny's final argument is an alternative to its breach of contract claims. Allegheny asserts that Virginia Power had the right to seek reimbursement from it for $924,219 in 1991, but that Virginia Power intentionally and knowingly waived that right. "Waiver" is an intentional relinquishment of a known right. *Stanley's Cafeteria, Inc. v. Abramson,* 226 Va. 68, 306 S.E.2d 870, 873 (1983). The party claiming waiver must show that its opponent had knowledge of "the facts basic to the exercise of the right" and the intent to relinquish that right. *Id.* Furthermore, that party must prove the elements of waiver by "clear, precise and unequivocal evidence." *Id.* (quoting *Utica Mutual v. National Indemnity,* 173 S.E.2d 855, 858 (Va.1970)). Allegheny asserts that the evidence at trial established Virginia Power's knowing and intentional waiver of its right to seek recovery of the $924,219, and that such recovery would today be barred by the statute of limitations.

The Court disagrees. First, the Court notes that no statute of limitations applies in this situation. If Virginia Power were to seek recovery of the $924,219 as part of the "Tax Effect on VEPCO," it would do so under the terms of Paragraph 9 of the TIA. No statute of limitations would be triggered until Virginia Power's request was denied and a cause of action thereby accrued. *See Whitehurst v. Duffy,* 181 Va. 637, 26 S.E.2d 101, 103 (1943). Because these conditions have not occurred, the statute of limitations is irrelevant.

■ Second, the Court holds that Allegheny failed to prove a waiver by clear, precise, and unequivocal evidence. In-

deed, the statements emphasized by Allegheny are good examples of equivocal evidence. Allegheny emphasizes that Virginia Power concluded in 1992 that reimbursement was not warranted "at the time" and other employees in the organization expressed their understanding that the company would not seek reimbursement. *See* Plaintiff's Post–Trial Brief, at 23. This evidence, however, is simply too ambiguous to meet the standards for waiver.

■ Moreover, none of the testimony on which Allegheny relies derives from Virginia Power's top management or directors. A contract right, however, may only be waived by the party for whose benefit it was intended or the duly authorized agent of that party. *See* 28 Am.Jur.2d Estoppel and Waiver § 155 (1966). Even if the statements by Virginia Power employees demonstrated a clear intent to waive the company's rights under Paragraph 9, Allegheny did not establish that these employees had the authority to bind the company. Finally, Paragraph 15.12 of the Project Agreement provides that any amendment or supplement to the Agreement must be in writing and signed by a high-ranking officer or director of each organization. This provision indicates the parties' intent that modification of substantial contract rights would require corporate approval from the highest level, not mid-level managers. In sum, the Court finds that Allegheny's evidence did not demonstrate the intentional relinquishment of a known right.

## C. *Virginia Power's Counterclaim*

Virginia Power has asserted a counterclaim for costs incurred pursuant to the contracts. The TIA requires Allegheny to pay all costs associated with the refund claim, including those costs incurred by Virginia Power. Allegheny has conceded its obligation to pay these costs, which the parties have stipulated to be $2,388.50.

### III.   Conclusion

In light of the foregoing analysis, Allegheny's claims are hereby denied and Virginia Power's counterclaim is granted.

### ORDER

In accordance with the attached Memorandum, it is this 13 day of October 1999, by the United States District Court for the District of Maryland, ORDERED:

1.   That Plaintiff's claim BE, and the same IS, hereby DENIED;

2.   That Defendant's counterclaim for damages BE, and the same IS, hereby GRANTED and Plaintiff is ORDERED to pay to the Defendant the sum of $2,388.50;

3.   That judgment BE, and the same IS, hereby ENTERED in favor of Defendant; and

4.   That copies of this Memorandum and Order be mailed to counsel for the parties.